514 F.2d 1291
 27 A.L.R.Fed. 646
 CAMECO, INC., Plaintiff-Appellee,
v.
S. S. AMERICAN LEGION, her engines, etc., and United States
Lines, Inc., Defendant and Third-Party Plaintiff-Appellant,
v.
SULLIVAN SECURITY SERVICES, INC., Third-Party Defendant,
and
International Terminal Operating Co., Inc., Third-Party
Defendant-Appellant.
 Nos. 39, 64, Dockets 74-1180, 74-1182.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 27, 1974.
Decided Dec. 16, 1974.
 
 Robert W. Mullen, New York City, for appellant.
 Robert J. Giuffra, New York City, for cross-appellant-appellee.
 Martin B. Mulroy, New York City, for plaintiff-appellee.
 Daniel Huttenbrauck, New York City, for third-party defendant-appellant.
 Before LUMBARD, FEINBERG and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal raises yet another question under the "package" limitation of $500 as used in § 4(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5), as well as questions of responsibility, in the first instance and inter sese, among the shipowner, the terminal operator and the security service employed by the terminal operator. The shipment consisted of a quantity of Danish canned hams which were in turn packed in corrugated cartons, sometimes referred to as "cases." Some of the cartons were strapped on pallets. All of the cartons and pallets were in turn placed in a 40' x 8' x 8' refrigerated shipping container. The United States District Court for the Southern District of New York, Charles M. Metzner, Judge, held that the carrier (United States Lines, Inc.) was liable to the consignee (Cameco, Inc.) for an apparent theft occurring before delivery at the terminal in the United States and that the terminal operator (International Terminal Operating Co., Inc., hereinafter ITO) was liable to the carrier on the claim over for failing to perform its services in a workmanlike manner, but that the security service (Sullivan Security Services, Inc., hereinafter Sullivan) was exonerated from any liability. The district court also held that the overall container was not a single package within the limitation provision of COGSA but that the four pallets were packages as were the individual cartons separately packed. Since 270 cartons and the four pallets of 100 cases each were lost by theft, damages were awarded in the total sum of $19,700 with interest and costs.[1]
 
 
 2
 We affirm.
 
 
 3
 Plaintiff-appellee, Cameco, Inc., is in the business of importing canned meat products from Denmark and other European countries. In November, 1968, it purchased a quantity of Danish canned hams from Odense Export, the Anglicized name of the Danish meat packer, which was the shipper here. Cameco received in due course an invoice, an ocean bill of lading, official meat inspection certificates and a certificate of insurance.
 
 
 4
 The bill of lading consisted of the usual short form which incorporates the terms of the long form. It referred to the port of loading as "Odense/Hamburg," the shipment as "ship/truck," and under the heading "Number and Kind of Packages Description of Goods," it said "-1-container said to contain:" and then spelled out the number of cartons with tins and weight per tin as, for example, "-100-cartons 6/11 lbs. Cameco pork shoulder picnic," listing the gross weight. The bill provides no space for inserting the value of the goods. The bill also referred to the shipment as "perishable," and contained the statement "Keep Under Refrigeration." It also contained the typewritten insertion: "Basis House to House Delivery. Shipper's load and count. Freight prepaid to be stowed under refrigeration at temperature between 32 and 38 degrees Fahrenheit." The bill of lading was signed on behalf of United States Lines by N. P. Hansen & Co., which was the trucker which carried the container from Odense to Hamburg, and the bill of lading was stated to be issued at Odense.
 
 
 5
 The container itself was, as we have said, a refrigerated one belonging to United States Lines. The ship on which the goods were to be shipped was the S.S. American Legion, a containership containing no internal refrigeration itself. N. P. Hansen & Co., it was stipulated by United States Lines, was its agent, although ITO disputes the binding effect of this stipulation upon it. The shipper's foreman counted the cartons and pallets placed in the container which remained on the flat truck during the loading process. Loading consisted of placing the cases of tinned hams in the container first, followed by the four pallets. Charges of the trucker from Odense to Hamburg were paid by United States Lines. The ocean freight was computed on the gross weight of the cargo stated in the shipper's invoice, that is, with the weight of the container not included. This rate was $50 per 1,000 kilos, on the basis that because the shipment was "house to house" as stated in the bill of lading, the steamship company saved the cost of stuffing and unstuffing the container and tallying, checking and labor costs at both ends were reduced; accordingly, there was a 10 per cent reduction in the ordinary freight rate applicable to break bulk cargo.
 
 
 6
 The only evidence in the case related to "packaging" was that cans of ham are customarily shipped in corrugated cartons or cases such as those used here, whether those cartons are shipped in containers, on pallets or as loose cargo. There was testimony that the corrugated cases were the form of packaging for loose cargo or bulk shipments prior to the days of widespread use of containers.
 
 
 7
 The hams remained on the New Jersey pier as a result of a mix-up in Hamburg. There was some thought, apparently, that the container could not be placed on board the S.S. American Legion. Accordingly the shipper notified the plaintiff that the hams were not carried on that vessel when it left Hamburg on November 19, but would probably go on the S.S. American Liberty sailing on November 26. In fact, however, the container had been stowed in the S.S. American Legion. Upon checking with United States Lines on November 27, 1968, Cameco was told that the container was not on the S.S. American Legion, so that when that ship did arrive on November 26 no pick-up had been arranged for by the consignee, Cameco. This was contrary to its usual custom of immediately taking away the container so as to avoid losses by pilferage, etc., as well as, we assume, to defeat the expiration period after which demurrage charges start to run. The cargo was discharged from the S.S. American Legion, but when nobody came to pick it up the United States Lines finally on December 6 called Cameco to inquire why. It was not until December 10 that Cameco received verification from the carrier that the shipment was on the pier. Shortly thereafter, on December 10, the Verona Police Department called Cameco's office to say that the Jersey City Police Department had recovered 230 cartons of hams with Cameco's labels found in a truck belonging to "Dobbs Rentals." While the carrier and terminal operator both claim that there is no way of knowing what happened to the hams after they arrived at Pier 66 in Port Elizabeth, New Jersey, and ITO and Sullivan each claim that this was a "mysterious disappearance," the trial court found, and we think the finding is justified by logical inferences from the evidence, that there had been a theft of the container and hams from the storage area across the street from the terminal building. That storage area had not been completed. At the east gate of the storage area no security guards were posted, nor was a check made concerning the movement of vehicles either through or out of that gate. The only location where security guards were posted and logs kept was at the main gate. The western portion of the area was unfenced and only one guard, if any, was assigned to this area depending on circumstances. Containers were moved by ITO from the terminal to the storage area for storage purposes, and at the time in question there was no catalog or log kept to indicate where a given container was.
 
 
 8
 It is probably not altogether insignificant that the two men who had the 230 cartons in question subsequently pleaded guilty to the charge of possession of stolen hams, and there is no doubt from the markings on the cases of tinned hams that these were a portion of the original shipment.
 
 
 9
 On the question of responsibility, the United States Lines claims that it is not responsible to the consignee and holder of the bill of lading because Clause 2 of the regular long form bill of lading provides that it "shall not be liable in any capacity whatsoever for any loss or damage howsoever or wheresoever occurring unless shown to be caused by the negligence of the carrier . . . ." And indeed the carrier contends that Cameco had itself to blame for failing to obtain delivery or to clarify the arrival and discharge of the container on the S.S. American Legion. The carrier also contends that under the law of New Jersey and New York, once the carrier submits proof that the goods were stolen, the burden of proof is on the consignee to show negligence of the carrier and none was shown because the carrier obtained the services of an experienced terminal operator, ITO, to provide both watching services and security at the terminal.
 
 
 10
 The carrier also claims, and the trial court held, that the terminal operator, ITO, was responsible for the loss, because ITO exclusively controlled the discharge, delivery and watching of the cargo and breached its duty to perform its contractual duties in a workmanlike manner. David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965). The carrier contends that Sullivan was liable on the basis that Sullivan was delegated the duty and responsibility by ITO to provide security and watching services and in turn breached its warranty of workmanlike guard service; thus the carrier's claim is in effect as a third party beneficiary of the ITO-Sullivan contract.
 
 
 11
 ITO joins the carrier on the proposition that there is no responsibility to the consignee but principally relies for exculpation on the basis of its contract with United States Lines, Paragraph 13(b) of which states that ITO "when performing any services in connection with the receiving, delivering, watching and/or storing of cargo is acting as the agent of the Carrier, and, as such, is not to be considered as a bailee of the cargo." ITO also relies on the provision of Paragraph 13(a) of the contract exempting it from responsibility "for claims resulting from mysterious disappearance of cargo. . . . " In this regard ITO also points to a provision in Paragraph 1(d) of the contract that its agreement to provide routine watching services is "not intended to be construed as an insurance in the case of either fire of theft."
 
 
 12
 Sullivan relies on the district court conclusions that Sullivan properly performed the services to the extent it was required to under its contract and at the direction of ITO, and that ITO had "failed in requesting adequate service and following suggestions of Sullivan." Sullivan, thus, seeks to rely on Royal Typewriter Co. v. M/V Kulmerland, 346 F.Supp. 1019, 1025 (S.D.N.Y.1972), aff'd, 483 F.2d 645 (2d Cir. 1973), and Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971).
 
 
 13
 On the package limitation issue the consignee, of course, contends that each of the separate cases of tinned hams and each of the pallets was, as the trial court held, a "package" within the COGSA limitation. The carrier and terminal operator join in the contention that the container itself was the package, so that the total recovery on the part of Cameco would be limited to $500 in any event.
 
 
 14
 On the question of responsibility, we agree with the trial court. The trial court found on the evidence that the information that the hams were not carried on the S.S. American Legion when it left Hamburg on November 19 but instead would be sent on the S.S. American Liberty leaving on November 26 "was confirmed to the plaintiff by U. S. Lines on November 27." This finding was supported by evidence that Cameco's traffic manager, Frank Addeo, called United States Lines on November 27 to obtain confirmation of shipment and particularly questioned whether the shipment was on the S.S. American Legion, and that United States Lines advised him that it was "short-shipped" on the S.S. American Legion, which means that the cargo did not go on the S.S. American Legion, and that it would be shipped on the S.S. American Liberty. By virtue of this erroneous advice, Cameco did nothing to pick up the shipment. It was not until December 6 that the advice was corrected and December 10 when verification was furnished to Cameco that the hams had arrived and were at the terminal. Judge Metzner held that in view of the United States Lines' original advice that the shipment was not on the S.S. American Legion, Cameco was justified in requesting verification of the December 6 notification and that its responsibility to pick up the shipment did not commence until that verification. Thus the court held that there was a delivery to the carrier and nondelivery of the cargo because it was stolen while it was in the custody of the carrier under the contract of carriage. Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d at 807.
 
 
 15
 United States Lines contends that there was no affirmative proof of its negligence and that its duties were fully performed when it delivered the container to a responsible terminal operator. United States Lines, however, was perfectly aware that ITO was using the unenclosed "farm area" across North Fleet Street where containers were stored when the terminal was itself jammed up. Thus its responsibility for what occurred was coexistent with ITO's, since it selected ITO as its terminal operator and discharged the cargo into ITO's custody. The carrier makes no contention on this appeal that in some way Cameco should have been able to pick up the cargo between the time of verification on the 10th and the time it was stolen (which may indeed have already occurred), it being agreed by United States Lines that it was "(a) lmost simultaneously" with obtaining the confirmation that Cameco received notification that the police in New Jersey were holding the men who had in their possession some of the hams in question.
 
 
 16
 So, too, ITO's responsibility over on a third party claim by the carrier was correctly found by the trial court. The discharge, delivery and watching of the cargo at Berth 66, Port Elizabeth, New Jersey, was controlled exclusively by ITO in accordance with the warranty implied by law, David Crystal, Inc. v. Cunard Steam-Ship Co., supra, as well as under the terms of the contract with the carrier. ITO tallied the container off the vessel and had complete responsibility for security at the terminal. While United States Lines knew that the farm area was used, nevertheless once custody of the cargo was given to ITO, it became ITO's primary responsibility to secure the container's safety. The facts that ITO did not even know where the containers in its terminal were and that no logs were kept on the movement of trucks, coupled with the fact that the warehouse area was unfenced and that security at one end of the terminal was plainly deficient, compel liability here. See also Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Stein, Hall & Co. v. S.S. Concordia Viking, 494 F.2d 287, 290 (2d Cir. Mar. 13, 1974). There is no express disclaimer of the implied warranty in the contract. While there is a provision that there is no guarantee or insuring against loss by fire, theft or pilferage, nevertheless the implied warranty was not properly performed. Nor may ITO obtain absolution by virtue of the "mysterious disappearance" clause, since there is every indication that the container was removed through the open and unwatched east gate.[2]
 
 
 17
 Sullivan's liability presents a somewhat more difficult question, and United States Lines argues that if ITO is liable for its breach of warranty of workmanlike services, so is Sullivan. See Italia Societa v. Oregon Stevedoring Co., supra. But the trial court found that ITO had failed to request adequate service from Sullivan and failed to follow Sullivan's suggestions. These findings are supported by the evidence. ITO made the determination not to maintain logs at the east gate of vehicles passing back and forth on the apparent basis that that gate was to be used for empty containers only by ITO "yard hustlers," which are tractors of a particular design for rapid movement of containers on chassis. This was over the objection of Sullivan, which opined to ITO "that every movement of containers in and out of the terminal should be recorded" and that they "should be logged in and logged out at all times." Apparently ITO was fearful that logging would slow up the "hustling" operation. "Reefer" (refrigerated) containers, it should be noted, were generally kept on mounts, that is, on chassis, so that all that was necessary to move them about was to hook up a yard hustler or any tractor. In short, this is not a case like Sperry Rand Corp. v. Norddeutscher Lloyd, 1973 A.M.C. 1392 (S.D.N.Y.1973) (Lumbard, J., sitting by designation), where Sullivan violated its obligations by delaying 11 days in searching for a stolen container. ITO hired only one roving guard through Sullivan and there is no indication that he was negligent, particularly after Sullivan itself specifically warned ITO of its inadequate security measures.
 
 
 18
 We come then to the package limitation question, and this, of course, is a constantly recurring one in the Second Circuit. See, e. g., Royal Typewriter Co. v. M/V Kulmerland, supra; Nichimen Co. v. M. V. Farland, 462 F.2d 319, 334 (2d Cir. 1972); Leather's Best, Inc. v. S.S. Mormaclynx, supra; Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7 (2d Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d 943 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967). These cases treat the "package" limitation one thought by many to be unrealistic in amount and one that was determined at a time when shipping by container was unknown under § 4(5) of COGSA in the light of modern container shipping economics, as affected by marine insurance considerations. The thrust of our cases has been to seek to arrive at the parties' intent and to search for some degree of certainty and predictability which would enable shippers, carriers, underwriters and courts to determine the difficult conundrum: "When is a package not a package?" See Mitsubishi International Corp. v. S.S. Palmetto State, 311 F.2d 382, 383 (2d Cir. 1962), cert. denied, 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963), and Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d at 947. Compare DeOrchis, The Container and the Package Limitation The Search for Predictability, 5 J.Mar. L. & Com. 251 (1974) (hereafter DeOrchis), with Simon, The Law of Shipping Containers, 5 J.Mar.L. & Comm. 507 (1974) (hereafter Simon). See also Hall, Container Package Issue Shrouded in Judicial Nebulae, Lloyd's Transportation Review (1974); Diplock, Conventions and Morals Limitation Clauses in International Maritime Conventions, 1 J.Mar.L. & Comm. 525 (1970).[3]
 
 
 19
 Our cases may each be summarized as follows: in Standard Electrica, by a 2-1 decision, pallets of television tuners were held to be packages and the majority of the court considered that the "packaging" issue could be answered by two questions prior to arranging insurance: whether the shipper chose the use of the pallet or container, and whether the bill of lading described the pallet or container as a package.[4] The package limitation question was never reached by the majority in Hong Kong Producer because it held that there was an unreasonable deviation by the carrier in that the container was carried on deck under a clean bill of lading; note, however, must be taken of Judge Hays' dissent indicating that each individual metal container of cartons of encyclopedias (described in the bill of lading as "1 metal container . . . said to contain: 536 ctns bound books") was "the functional packing unit" and that accordingly the $500 per package limitation should have applied to the containers. Leather's Best held, in reference to a container shipment consisting of 99 bales of leather which were loaded into the carrier's container on the seller's premises where the bales were actually tallied by the carrier, that the container was not the package and the 99 bales of leather were each to be treated as packages for purposes of the COGSA limitation.
 
 
 20
 In Nichimen there were rolled steel sheets strapped with steel bands, some wrapped in burlap, some not, and these were each treated as a functional unit and each as a package, although a container shipment was not involved. In Kulmerland it was held that 350 cartons of adding machines shipped in a container with a bill of lading referring simply to "1 Container said to contain Machinery" were not individual packages but rather that the container was a package. The Kulmerland panel in affirming Judge Tyler's decision referred to a "functional package unit" test or "functional economics" test saying that the first question was "whether the contents of the container could have feasibly been shipped overseas in the individual packages or cartons in which they were packed by the shipper." This test was, however, not to be conclusive for purposes of determining what is a COGSA package, but simply was set forth as establishing the burden of proof, the court saying that where the shipper's own packing units are functional there is a presumption that the container is not the package which must be overcome by evidence supplied by the carrier that the parties intended to treat it as such, and that contrariwise where the shipment is not a functional packing unit the burden shifts to the consignee to show by other evidence that the shipper's units are by themselves packages. 483 F.2d at 649. The court referred to such items as custom and usage in the trade, the parties' own characterization and other factors as bearing on the parties' intent. While Kulmerland has been the subject of some criticism,[5] that criticism depends to some extent on whose ox is gored. The decision has also been considered as equitable and followed by the courts in Canada and France, note 3 supra, as well as the court below in this case. It is to be recollected that the Kulmerland test is by no means conclusive of the result; it simply goes to the burden of proof. Recent district court cases are consistent with Kulmerland. Rosenbruch v. American Export Isbrandtsen Lines, Inc., 357 F.Supp. 982 (S.D.N.Y.1973) (Tyler, J.), held in the case of household goods shipped in a container, where the bill of lading referred to "1" under the entry "Number of Cont. and Other Pkgs" and described the contents as "said to contain household goods," that the container was a single package. So, too, Sperry Rand Corp. v. Norddeutscher Lloyd, supra, held in the case of a container shipment of 190 cartons of shavers, with a bill of lading referring to a container as the package and describing the contents as 9,500 apparatus electrical dry shavers but giving no indication that 190 cartons were inside, that the container was a package, looking to the parties' intent.
 
 
 21
 In the case at bar, it is apparent that under Kulmerland the cases of tinned hams and the pallets of tinned hams respectively met the functional packaging unit test of Kulmerland and accordingly put the burden of proof on the carrier to supply evidence that the parties intended to treat the container as a package. This the carrier did not do. Here the use of the container was as much for the shipowner's benefit as for the shipper's. Here the ship was a containership, and these goods could not have been shipped by way of the ship absent a refrigerated container, since there was no refrigeration as such in the ship. Here a 10 per cent discount was supplied the shipper on the basis that the carrier could avoid stuffing and unstuffing or loading and unloading costs thereby. Here the trucker who carted the carrier's container was the carrier's agent. He was present at the shipper's tally and count and could have participated in it.[6] Here the bill of lading specifically set forth the number of cartons of tinned hams and the respective number of tins and weight per tin in each carton, unlike the one container said to contain machinery in the Kulmerland case or the one container said to contain household goods in the Rosenbruch case. Here as in Leather's Best, supra, the bill of lading described the goods as one container "s/t/c" a specific number of cartons or bales, etc.
 
 
 22
 In short, under our cases the conclusion of the district court was correct, and it is consistent with them. As to the Kulmerland test, it may be added that from the shipper's point of view, where his goods are already packaged for export and possibly thereby for distribution like the cartons of tinned hams here, should he be penalized (by having to pay for extra insurance which is usually cheaper than declaring and paying the carrier for excess value) for shipping by container, at least where as here the use of the container is for mutual benefit? Where the cargo is not so packaged, the shipper will have to overcome the presumption that he used the container itself as a package. Whether or not there is economic waste created by a shipper packing in functional units when a container is available depends on whether the goods would have to be repacked for distribution if not functionally packaged at the place of origin. Knowing where the presumption lies, the shipper may still decide it is more economical to use the container as a package when it is more expensive to package the goods rather than insure them, such as household goods in Rosenbruch. From the carrier's point of view, while it is argued, DeOrchis, supra, that the carrier has no way of knowing how the goods inside a sealed container are packed, the carrier can through its agents, as here, be present even at a "house to house" container stuffing, or can require greater specificity in the bill of lading. If the carrier is not present at the container loading and has no other means of obtaining information as to what is inside the container such as by the data inserted in the bill of lading (the accuracy of which has to be proved at trial, as it was here, whenever cartons are considered packages) he might then be able to overcome the burden of proof imposed upon him by Kulmerland in the case of export-type packages shipped by container.
 
 
 23
 We are aware that the ultimate question in a cargo case is usually one of allocation between the cargo underwriter on the one hand and the protection and indemnity (P & I) insurer of the carrier on the other.[7] See Diplock, supra. The gross cost of transportation insurance to the cargo owner includes the premium he pays his own underwriter directly plus the carrier's insurance expense which is built into the freight rate and covers the risks the carrier undertakes in the bill of lading or that are imposed upon him by law. Utilizing a burden of proof which allocates risks according to the manner in which goods are initially packaged will, perhaps, until some better test is devised, give more predictability to allocation of insurance risks. Surely carrier's insurers can determine from a study of bills of lading how many containers are used without specification of the contents and how many contain specific numbers of "packages" for calculating insurance rates that accurately reflect risk. To hold in all cases that a container is a package is to defeat the purpose of COGSA, which is to protect shippers from the overreaching of carriers through contracts of adhesion and to provide incentive for careful transport and delivery of cargo. The argument by DeOrchis, supra, that all shippers, regardless of choice, must bear, in increased freight costs, the increased insurance rates of carriers is unpersuasive since that argument would support the repeal of COGSA and the purpose that act seeks to promote. At the same time, to suggest, as Simon, supra, does, that in no event can a container be treated as a COGSA package is to ignore the interplay between cargo insurance procurable by a shipper and P & I insurance.
 
 
 24
 Probably, however, this area is one, like so many in the law, in which the search for predictability and avoidance of litigation will go on regardless of what we may do, and we are aware, as Judge Feinberg pointed out in his dissent in Standard Electrica, that "certainty at the expense of legislative policy and equity is undesirable and often turns out to be ephemeral." 375 F.2d at 948. Until there is a legislative solution to the container-package question, one which does not appear readily forthcoming, the courts will have to deal with the cases as they arise.
 
 
 25
 Judgment affirmed.
 
 FEINBERG, Circuit Judge (concurring):
 
 26
 At the risk of appearing ungracious, in view of the majority's quotation from my dissenting opinion in Standard Electrica, 375 F.2d at 948,[1] I nevertheless feel compelled to add a brief word. There are many problems arising out of the "package" test announced in Royal Typewriter Co. v. M/V Kulmerland, 483 F.2d 645 (2d Cir. 1973).[2] However, we are bound by it for the present, and in this case the result reached is clearly equitable. Accordingly, I concur.
 
 
 
 [1]
 The invoice covered 100 cartons of 6/11 pounds of picnic hams with a net weight of 6,600 pounds and a value of $4,752; 100 cartons each of 3/21 shankless hams with a total net weight of 6,300 pounds and a value of $5,859; 300 cartons each of 4/15 shankless hams with a net weight of 18,000 pounds and a value of $16,740; and four pallets each of 100/21 shankless hams with a net weight of 8,400 pounds and a total value of $7,812. Thus, 100 of the cartons contained six tins, each of which had an 11-pound picnic ham; 100 cartons contained three tins each of 21 pounds; 300 cartons contained four tins of 15 pounds; and each of the pallets contained 100 tins of 21 pounds each. The shipment was C.I.F. New York, and after commission and a 2 per cent discount for cash within eight days the total cost paid out by plaintiff-appellee was $32,161.28. The damages allowed take into account 230 cartons recovered
 
 
 [2]
 It is interesting that the opinion of the court below contains a statement that the defendant carrier failed to show that the disappearance of the cargo was in any way attributable to ITO's negligence. This seems to be inconsistent with the rest of the court's findings and indeed in the sentence immediately following that statement Judge Metzner said:
 I find that (the defendant carrier) failed to show that ITO exercised "such a degree of care in guarding the container that the loss could not have been due to its negligence regardless of how the container was removed from the storage area." Leather's Best, supra at 813.
 In any event, the trial court did hold, and we sustain its finding and conclusion of law, that ITO breached its contract with United States Lines in that it failed to perform its duties in a workmanlike manner.
 
 
 [3]
 See also McDowell, Containerization: Comments on Insurance and Liability, 3 J.Mar.L. & Comm. 503 (1972). Interestingly, there appear to be no English cases on the subject, Hall, supra, although there are Canadian cases, in the most recent of which, Lutfy v. Canadian Pacific Ry. Co., (1973) Canadian Federal Court Reports, 1115, the court follows the Kulmerland case. See also Maison Perrigault S.A. Courier & Cie v. Capitaine du S.S. Breitenstein, European Transportation Law , Tribunal de Commerce du Havre, Oct. 19, 1973 (bags of rice not marked were not packages when shipped in container)
 
 
 [4]
 While at least one commentator seems to argue that the Standard Electrica questions should virtually always answer every case, DeOrchis, The Container and the Package Limitation the Search for Predictability, 5 J.Mar.L. & Comm. 251 (1974), the fact is that this case illustrates that this is not so. Here neither of the Standard Electrica questions is simply answerable on our facts: if the shipper chose the use of the container, it was at the carrier's behest and indeed shipment could not have been made on the carrier's ship, which was a containership, had a container not been used; here, too, the bill of lading describes the package and goods being shipped as one container, said to consist of certain numbers of cartons of hams and pallets of hams, accurately described, and by weight, which were subject to count even if not actually tallied by the carrier's trucker who was conceded by the carrier to be its agent. Thus Standard Electrica does not conclude either issue
 
 
 [5]
 DeOrchis, note 4 supra, criticizes its "functional economics" test from the carrier's point of view, urging that it is unrealistic in that it forces the carrier to look beyond the description of the bill of lading or beyond the outer packing to investigate the contents of each shipment. 5 J.Mar.L. & Comm. at 253. Simon, The Law of Shipping Containers, 5 J.Mar.L. & Comm. 507 (1974), criticizes Kulmerland from the shipper's point of view, urging that the Kulmerland test is anachronistic and irrelevant. 5 J.Mar.L. & Comm. at 520. Each argues that the decision would foster economic waste by requiring the shipper to package container-shipped goods expensively in order to avoid the COGSA limitation. Interestingly, DeOrchis would apparently by applying the Standard Electrica test consider that a sealed container is a "package" in almost any, if not every, case, id. at 253, 277-79; he argues that the result in Kulmerland was correct, id. at 279, and criticizes Leather's Best as setting the stage for confusion, id. at 264. Simon considers that a container is never a package, id. at 515, and accordingly thinks the result in Kulmerland was erroneous, but that Leather's Best was sound
 
 
 [6]
 It is interesting that now Cameco has an independent third party present at container stuffing. Where this is the practice in the trade, a carrier should not have any difficulty in ascertaining what is being shipped in the container, though it may not know the value of the individual items. But from an insurance point of view it is only interested in its overall exposure since it insures the overall cargo on shipment or a series of cargoes on assorted shipments. Thus each individual shipment has a minimal significance to it
 
 
 [7]
 We are also aware that the "P & I Clubs" are still active, that is, associations of shipowners spreading and absorbing members' liabilities. See G. Gilmore and C. Black, The Law of Admiralty (1957) at 69
 
 
 [1]
 There is a special affection for dissenting opinions, those often-neglected and frail judicial offspring
 
 
 [2]
 See Simon, The Law of Shipping Containers, 5 J. of Maritime Law and Commerce 507 (1974); DeOrchis, The Container and the Package Limitation the Search for Predictability, 5 J. of Maritime Law and Commerce 251 (1974)