In the Matter of the Complaint of NOR-FOLK, BALTIMORE & CAROLINA LINE, INC., as Owner of the TUG DOROTHY H and CONTAINER TRANSPORT # 1 for Exoneration from or Limitation of Liability.

Civ. A. No. 79–164–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Oct. 4, 1979.

Walter B. Martin, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, Va., for petitioner.

Francis N. Crenshaw, Crenshaw, Ware & Johnson, Norfolk, Va., for Maritime Terminals, Inc.

William B. Eley, Eley, Rutherford & Leafe, Norfolk, Va., Raymond P. Hayden, Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for Consolidated Fibres, Inc. and Manila Paper Mills, Inc.

R. Arthur Jett, Jr., Jett, Agelasto, Berkley, Furr & Price, Norfolk, Va., Kirlin, Campbell & Keating, New York City, for United States Lines, Inc.

## OPINION AND ORDER

CLARKE, District Judge.

On December 28, 1978, the Tug DOROTHY H and CONTAINER TRANSPORT # 1 arrived at Norfolk International Terminals, after journeying from Baltimore, Maryland. Shortly thereafter, CONTAINER TRANSPORT # 1 capsized and sank, dumping her cargo of containers into the water adjacent to her berth. Norfolk, Baltimore & Carolina Line, Inc. (NBC), a Virginia corporation, has filed this suit for exoneration from or limitation of liability, under the Limitation of Liability Act, 46 U.S.C. § 181–89 (1976),[1] for all claims arising from this mishap.

Responding to NBC's Complaint, United States Lines, Inc. (US Lines), a Delaware corporation, filed a claim against NBC for $7,000,000, representing the amount of damage to 93 containers shipped by US Lines on CONTAINER TRANSPORT # 1, and other costs incurred by US Lines as a result of this incident. NBC has moved for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. NBC seeks a ruling from this Court that, under the terms of the tariff and bill of lading, which formed the contract of carriage, any liability which NBC may ulti-

mately have to US Lines is limited to $500 per container.

## I. Background

US Lines, through its authorized agent, contracted with NBC for the transportation of 96 containers from Baltimore to Norfolk, Virginia. Twenty-six of the containers were 20 feet in length and 70 were 40 feet in length. Two of the 40-foot containers were empty. All of the other containers held various commodities destined ultimately for other ports of the United States or ports abroad. These containers, the parties agree, were owned by US Lines, and were packed and sealed prior to their delivery to NBC by someone other than NBC or its agents. Thus, NBC was unable actually to observe the contents of these containers.

The first page of the bill of lading, prepared and signed by US Lines, contained the following provisions regarding NBC's liability:

> NOTE: Shipper hereby certifies that he is familiar with all the terms and conditions of the said Bill of Lading as referred to above, including those on the back thereof, as well as those on the back hereof as set forth in the tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns. Shipper further hereby certifies that unless otherwise specifically declared in the space provided below (and on the reverse side hereof) the value of each loaded or empty container or trailer, including the contents, if any, is hereby specifically agreed or declared by shipper to not exceed $500.00

> .  .  .  .  .

> Shipper hereby authorizes carrier to place excess liability insurance in the amount

1. 46 U.S.C. § 183(a) (1976) provides:

(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or

forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

of $_____ (if none—so state) at rate of 10¢ per 100. Thereof in accordance with the terms of the back hereof.

In the blank provided for the declaration of excess liability, three x's were placed, apparently by US Lines. The reverse of the bill of lading contained the following provisions:

(a) All shipments made pursuant to the rates contained in the tariff governing this shipment shall be subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, and the carrier is entitled to avail itself of all rights, limitations, exemptions and immunities provided for in said Act, although the contract of carriage evidenced by this Bill of Lading, may be for the carriage of goods between ports of the United States. Pursuant to the provisions of said Act the liability of the carrier, if any, shall be determined on the basis of a value of $500 per customary freight unit (i. e., loaded or empty container or trailer) unless a higher value shall be declared by the shipper in writing, before shipment, on this Bill of Lading.

CLAUSE PARAMOUNT. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act, to any extent, such term shall be void to that extent, but no further. The carrier shall be entitled to avail itself of all rights, limitations, exemptions and immunities provided for in said Carriage of Goods by Sea Act, although the contract of carriage evidenced by this bill of lading may be for the carriage of goods between ports of the United States.

VALUATION. In the event of any loss, damage or delay in connection with any loaded or empty container or trailer, exceeding in actual value $500 per customary freight unit (i. e., loaded or empty container or trailer), in lawful money of the United States, the value of said loaded or empty container or trailer shall be deemed to be $500, and the carrier's liability, if any, determined on the basis of said value of $500, unless a higher value shall be declared by the shipper in writing before shipment and inserted in this bill of lading (see paragraph (b)). In no event shall the carrier be liable for more than the loss or damage actually sustained. The carrier shall not be liable for any consequential or special damage and shall have the option of replacing any lost container, trailer and/or contents or repairing any damaged container, trailer and/or contents.

(b) Shippers may, at their option, declare in writing a valuation in excess of the $500 limitation of liability provided in this bill of lading. When a shipper elects to declare a valuation on any loaded or empty container or trailer in excess of the $500 limitation of liability stipulated in this bill of lading, the transportation charges on the shipment will be computed on the basis of the rates named in the tariff governing this shipment, PLUS a charge of 10¢ per $100 of the value that is declared in excess of the $500 amount stipulated in this bill of lading.

## NO CARGO INSURANCE PROVIDED

The carrier will not provide insurance for cargo moving pursuant hereto. Any such insurance desired by shipper shall be obtained by shipper at shipper's expense.

## DEFINITION OF "TRAILERS" AND "CONTAINERS"

.    .    .    .    .

(b) The term "Container" as used in this Bill of Lading shall refer to demountable trailer bodies without wheels or bogies and furnished by the shipper, including their contents, if any.

Beneath these provisions were half a page of lines upon which the shipper was invited to give a "description of Container/Trailer" and to declare its value. These lines were left blank.

As the quoted provisions indicate, the bill of lading expressly incorporated the Carriage of Goods by Sea Act (COGSA) to govern the rights and liabilities of the parties; but for this incorporation, COGSA would not apply to this shipment between two domestic ports. Such shipments generally are subject to COGSA's predecessor statute, the Harter Act, 46 U.S.C. § 190–95 (1976); however, Section 13 of COGSA, 46 U.S.C. § 1312 (1976), expressly authorizes the incorporation of COGSA into bills of lading governing domestic shipments, and further provides that any bill of lading which incorporates COGSA "shall be subjected hereto as fully as if subject hereto by the express provisions of this chapter."

COGSA establishes certain limitations of liability which apply to shipments subject to that Act:

> (5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.
>
> By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided*, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.
>
> Neither the carrier nor the ship shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of lading.

46 U.S.C. § 1304(5) (1976).

NBC takes the position that its liability to US Lines is governed by COGSA, by reason of its incorporation by reference in the bill of lading; that each of the 93 containers is a separate "package" within the meaning of section 4(5) of that Act; and that its liability for damage to these containers and their contents accordingly is limited to $500 per container, absent a declaration of their higher value. Predictably, US Lines disputes this position, and contends that a shipping container may never be considered a package under COGSA, and that, in any event, it never was given an adequate opportunity to declare any excess value of the containers or their contents.

II. *Propriety of Summary Judgment*

■ Summary judgment upon all or any part of a claim may be granted to a party entitled to such judgment if there is no genuine issue of material fact in dispute. *Fed.R.Civ.P.* 56. Partial summary judgment, as requested in this case, is "intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit." *Luria Steel & Trading Corp. v. Ford*, 9 F.R.D. 479, 481 (D.Neb.1949). "If it appears on the motion for summary judgment that there is no triable issue with respect to a portion of the claim while there are triable issues with respect to the remainder," the Fourth Circuit has declared, "the Court, in its discretion, may enter a partial summary judgment . . . ." *Gadsden v. Fripp*, 330 F.2d 545, 547 (4th Cir. 1964). This procedure properly has been used in other cases to determine the precise issue now before the Court. *See, e. g., Rosenbruch v. American Export Isbrandtsen Lines, Inc.*, 357 F.Supp. 982 (S.D.N.Y.1973), *aff'd*, 543 F.2d 967 (2d Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *Lucchese v. Malabe Shipping Co.*, 351 F.Supp. 588

(D.P.R.1972). Although numerous issues remain to be tried in this case, determination at this time of the efficacy of NBC's attempts to limit its liability contractually will diminish the number of issues to be tried, thereby reducing the complexity of that trial.

Summary judgment may be granted "only where it is clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950). US Lines calls attention to certain facts which are disputed by the parties; however, none of these appear to be material to the determination of the question under consideration. US Lines has not seriously questioned that the bill of lading attached to NBC's counterclaim, and at other places in the record, together with the tariff, is an accurate facsimile of the parties' contract of carriage. Nor does it dispute that neither NBC nor any of its agents took any part in the packing or sealing of these containers, or that these containers were sealed when they were delivered to NBC, or that NBC made no visual inspection of the contents of the containers. The only relevant factual dispute relied upon by US Lines in its opposition to NBC's motion for summary judgment concerns whether or not a cargo list, attached to the affidavit of Lee D. Egenes, was delivered to an agent of NBC prior to the loading of the containers onto CONTAINER TRANSPORT # 1. US Lines contends that this question is relevant to determining whether or not NBC had actual or constructive knowledge of the contents of the containers, and their value, prior to their embarkation on board the transport vessel.

Even accepting US Lines' position that this list was delivered to NBC prior to loading, this fact is not material to resolving the question at hand. As a matter of law, nothing in this list could have given NBC notice of the actual contents of the containers or their value, which, as will appear from the reasoning below, is a determining factor in this case. This list contained only the following material information:

(1) The gross weight of each container;

(2) The size of the container;

(3) The container and seal numbers; and

(4) The name of the original shipper.

NBC could not have been expected to derive the contents and value of the individual containers from this skeletal information. Nor could the value of those contents have been determined readily from the freight manifest which US Lines claims was available to NBC upon request.

US Lines also inflates the significance of the Dangerous Cargo Manifest which it claims was delivered to NBC prior to the voyage. Although this document contained a partial listing of the contents of five of the containers, it in no way reveals the value of this cargo. Moreover, US Lines does not vigorously contend that this listing was ever intended by either party as a declaration of excess value for purposes of either COGSA or the terms of the bill of lading. Mr. Egenes, an employee of US Lines upon whose affidavit US Lines relies, admits that this Manifest was passed to NBC's Port Captain only after the containers had been loaded, and was given to this person only for the limited purpose of delivery to the Tug Captain. Moreover, it was never inserted in the bill of lading as required by section 4(5) of COGSA. Thus, the only significance of this Manifest is to show that US Lines complied with the applicable Coast Guard regulations concerning the transportation of dangerous cargo.[2] Be-

---

2. 46 C.F.R. § 148.02–3 (1978) provides:

§ 1408.02–3 Dangerous Cargo Manifest

(a) Each vessel, except for unmanned barges, transporting solid hazardous materials in bulk under the terms of this Part must have on board a dangerous cargo manifest, kept in a conspicuous place on or near the bridge house, on which the following information is entered:

(1) Name of vessel and official number. (If the vessel has no official number, the international radio call sign must be substituted.)

(2) Nationality of vessel.

(3) The name of the hazardous material as listed in § 148.01–7(a) of this Part.

(4) The hold(s) in which the material is being transported.

yond this, neither the Cargo List, the Freight Manifest, nor the Dangerous Cargo Manifest has any independent significance to the question presented in this case. Since no other material fact is genuinely disputed, and the necessary facts are available from the record, there appears to be no impediment to entertaining NBC's present motion for partial summary judgment.

### III. Shipping Containers and COGSA Packages

■ The effect of the parties' express incorporation of COGSA into the bill of lading was to make that Act merely a part of the contract, a term like any other. *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico*, 607 F.2d 322, No. 78–1749 (4th Cir. Sept. 19, 1979); *Pannell v. United States Lines Co.*, 263 F.2d 497, 498 (2d Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959). However, unless the parties intended to give any provision of this Act, as incorporated, a meaning other than its normal statutory meaning, and in the absence of any internal conflict between the Act's provisions and the other terms of the agreement, the parties are presumed to have intended the terms of that Act to be construed as though this contract were subject thereto by force of the statute itself. Therefore, except to the extent that the terms of that section were specifically modified or superseded by the express terms of the tariff or bill of lading, NBC and US Lines agreed to be bound by section 4(5) of the Act, limiting the carrier's liability for any loss or damage to $500 *per package,* or in case of goods not shipped in packages, per customary freight unit, unless the nature and value of such goods have been declared by the shipper *before shipment* and *inserted in the bill of lading.* Since nothing in the bill of lading specifically defines "package" as used in this section, the parties are bound by the statutory meaning of that term.

(5) The quantity of the material loaded in each hold.

(6) Date and signature of Master of the vessel's owner or his authorized representa-

At the risk of understatement, it is fair to say that whether a shipping container can ever be considered a "package" within the meaning of section 4(5) has been a question subject to judicial disagreement. As Judge Miller recently noted, the essence of the problem is to "determine what Congress would have thought about a subject about which it never thought or could have thought . . . ." *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico,* 455 F.Supp. 310, 313 (D.Md.1978), *reversed on other grounds,* 607 F.2d 322, No. 78–1749 (4th Cir. Sept. 19, 1979) (quoting from Chief Judge Brown's opinion in *Wirth Ltd. v. S/S Acadia Forest,* 537 F.2d 1272, 1276 (5th Cir. 1976)). The advent of containerized shipping was but a gleam in the eye of maritime technology in 1936 when Congress enacted COGSA. The question is not, therefore, whether Congress intended the term "package" to include shipping containers. Rather, we must determine whether the policies and principles which Congress intended to implement through that Act are properly applied and advanced by including the containers in this case among "packages" for the purpose of section 4(5). "The problem demands a solution better than the courts can afford, preferably on an international scale . . . ." *Leather's Best, Inc. v. S/S Mormaclynx,* 451 F.2d 800, 814 (2d Cir. 1971).

COGSA, like its predecessor, the Harter Act, had as a principal purpose the elimination of adhesion contracts, foisted upon the shipper as a result of the carrier's superior bargaining strength. *Standard Electrica S. A. v. Hamburg Sudamerikansche Dampfschiffahrts-Gesellschaft,* 375 F.2d 943, 945 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967). Section 4(5) of the Act was intended to remedy this imbalance by establishing a reasonable figure below which the carrier should not be permitted to limit his liability. *Leather's Best, Inc., supra,* 451 F.2d at 815. *Accord, Hearings on S. 1152, a Bill Relating to the Carriage of*

tive to acknowledge correctness of the dangerous cargo manifest.

*Goods by Sea, before the Senate Committee on Commerce* 47 (1935). The $500 per package limitation established by the Act fairly reflected the average worth of the usual parcel shipped in 1936; however, modern technology has made this figure hopelessly unrealistic. Any change in the amount of this figure, however, must come from Congress, and not from the courts. Through COGSA, Congress intended to establish a predictable unit with a predictable value, so that both the shipper and the carrier might understand their risks and protect their interests.

Although the wilderness of COGSA "packages" has been explored by an increasing number of courts, the Second Circuit without question has probed its boundaries with the greatest frequency and influence. In the absence of controlling precedent in our own circuit, therefore, a review of the development of the law in this area in that circuit will be instructive.

At a relatively early point, size and weight, standing alone, were rejected as sufficient criteria for determining whether a given unit was a COGSA "package." *See Mitsubishi Int. Corp. v. S. S. Palmetto State,* 311 F.2d 382 (2d Cir. 1962), *cert. denied,* 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963). *See also Shinko Boeki Co. v. S. S. Pioneer Moon,* 507 F.2d 342, 345 (2d Cir. 1974). In *Mitsubishi,* the court determined that three covered wooden boxes, each containing a single roll of steel weighing 32½ tons, and which had been packaged by the shipper, were separate packages within the meaning of section 4(5) of COGSA. The court concluded that "an article completely enclosed in a wooden box prepared for shipment is a 'package' within Section 4(5) of COGSA, regardless of the size and weight of the package." *Id.* at 384. *See also, Lucchese v. Malabe Shipping Co.,* 351 F.Supp. 588, 593 (D.P.R.1972).

Having established which factors were not to be considered conclusive, the Second Circuit turned to the task of formulating a manageable test for the resolution of this issue in light of modern maritime technology. In *Standard Electrica, supra,* the court,

in an opinion written by Chief Judge Lumbard, concluded that nine pallets, each containing six cardboard boxes of television tuners strapped to wooden platforms, constituted separate packages under section 4(5) of COGSA. To support this conclusion, the court noted that the pallets were referred to as packages at various places in the documents exchanged by the parties; that the shipper and not the carrier chose to make up the cartons into a pallet and delivered them to the carrier in that condition; and that the shipper had been provided an adequate opportunity to obtain full coverage simply by declaring the nature and value of the goods in the bill of lading and paying any accordingly higher tariff. That the individual cartons were visible was considered immaterial. *Id.* at 946.

This loose identification of relevant factors was reduced to a clearly articulated test by Judge Moore in *Aluminios Pozuelo Ltd. v. S. S. Navigator,* 407 F.2d 152 (2d Cir. 1968). In that case, the court held that a "toggle press," bolted to a wooden skid, was a "package," which it defined as "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Id.* at 155. The court emphasized that the skid was attached to the press by the shipper, primarily to facilitate delivery and to put it in a form suitable for transportation and handling. *Id.* But see, *Hartford Fire Ins. Co. v. Pacific Far East Lines, Inc.,* 491 F.2d 960 (9th Cir. 1974), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974) (transformer mounted on skids not a COGSA package); *Hanover Ins. Co. v. Drake Marine,* 440 F.Supp. 686 (D.P.R.1977) (press shipped unboxed, in open view, without skids not a COGSA package).

The Second Circuit first directly confronted the question presented in this case, whether a shipping container can ever be a COGSA package, in *Leather's Best, Inc. v. S/S Mormaclynx,* 451 F.2d 800 (2d Cir. 1971). In *Leather's Best, Inc.,* 11 tons of leather disappeared from a large shipping

container after it was unloaded from the ship. The leather had been bound by the seller into 99 "bales." At the request of the seller, the carrier supplied a large shipping container, owned by the carrier, into which the seller loaded the bales in the presence of the carrier's agent.

Considering whether the container was a COGSA package, Chief Judge Friendly took pains to distinguish that court's previous opinion in *Standard Electrica.* The pallets in the latter case, the court noted, were smaller than this container; moreover, unlike the bill of lading in *Leather's Best,* nothing in the shipping documents in *Standard Electrica* gave the carrier notice of the number of cartons contained on the pallets. With hesitation about the sufficiency of these distinctions, the court concluded that, under the limited circumstances of that case, the container was not a COGSA package. Chief Judge Friendly, however, surveyed the limits of this holding, noting that

it leaves open, for example, what the result would be if [the seller] had packed the bales in a container already on its premises and the bill of lading had given no information with respect to the number of bales. There is a good deal in Judge Hays' point in his dissent in [*Encyclopedia Britannica, Inc. v. S. S. Hong Kong Producer,* 422 F.2d 7, 20 (2d Cir. 1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970)] "that considering the containers as the packages promotes uniformity and predictability," at least where it contains goods of a single shipper. It is true also that the standard arguments about the economic power of the carrier and the weak bargaining power of the consignor may be simply a recitation of an ancient shibboleth, at least as applied to shipments of containers fully packed by the shipper. The shipper insures for any value in excess of the limitation (or perhaps for the whole value) and, for all we know, a ruling that each bale constituted a "package" may simply be conferring a windfall on the cargo insurer, admittedly the true plaintiff here, if it based its premium on the assumption that [the carrier's] liability was limited to $500.

451 F.2d at 815 (footnotes omitted). *See also, Shinko Boeki Co., Ltd. v. S. S. Pioneer Moon,* 507 F.2d 342 (2d Cir. 1974).

In *Royal Typewriter Co. v. M/V Kulmerland,* 483 F.2d 645 (2d Cir. 1973), Judge Oakes attempted to reduce these standards to a specific formula, which he called a "functional economics test." This test created a presumption that the shipper's original carton, rather than the container, is the appropriate COGSA package; however, the carrier may overcome this presumption with evidence that the parties intended to treat the container as a package. This test focuses upon whether the unit originally supplied by the shipper could efficiently and safely be transported by the carrier, or whether the container was necessary to expedite the handling and assure the safety of the cargo. Applying this test, Judge Oakes concluded that the individual cardboard cartons involved in that case were too flimsy to be transported separately, that they never had been shipped separately in the past, and, therefore, that the container in which they were shipped constituted the proper COGSA package. Importantly, the machines were placed in the container by the shipper's freight forwarder, at the shipper's direction. The bill of lading referred only to "1 Container said to contain Machinery," without any other indication of the nature or value of the container's contents.

In *Cameco Inc. v. S. S. American Legion,* 514 F.2d 1291 (2d Cir. 1974), the court, in a further opinion by Judge Oakes, reached the opposite result, holding that cartons of tinned hams and pallets of tinned hams respectively met the functional packaging unit test of *Royal Typewriter Co.,* thereby placing the burden of proof on the carrier to supply evidence that the parties intended to treat the container as a package. The court found that the carrier had not met that burden and accordingly held that each case and pallet was a "package" for purposes of COGSA. The court noted that the use of the container, which belonged to the shipper, was as much for the shipowner's benefit as for the shipper's and, as in the

instant action, that the ship was a container ship not capable of carrying bulk cargo. The court also noted that a representative of the carrier was present at the shipper's tally and count, and therefore, the carrier should not have had any difficulty in ascertaining what was being shipped in the container. Moreover, the bill of lading contained a detailed listing of the contents of the container.

The Second Circuit's latest decision concerning this issue gives token recognition to the "functional economics test" enunciated by Judge Oakes, but places particular emphasis on certain facts concerning the selection and packing of the container. In *Rosenbruch v. American Export Isbrandtsen Lines, Inc.*, 543 F.2d 967 (2d Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976), a different panel of the court held that a large container of household goods constituted a package for purposes of COGSA. The following facts were found to be determinative:

> [T]he shipper's agent alone loaded the container which he obtained from the carrier, rather than constructing separate wooden crates or containers. The metal container was loaded with the shipper's goods only, not those of any other shipper. The contents of the container were not separately packed or labeled. The shipper's agent selected the voyage and the vessel for the shipment. He stated on the bill of lading that one package or container was involved and described the contents as "used household goods." The carrier was not involved at all in packing the container.

*Id.* at 970. "While the facts of these package cases vary widely," the court concluded, "this is about as clear a one as we have seen for holding that the container constituted a package for the purposes of Section 4(5) of COGSA. Indeed, it comes very close to the hypothetical case envisioned by Judge Friendly in *Leather's Best* . . . where the shipper would load the container on his own premises and the bill of lading would disclose nothing with respect to the number of units within the container."

This Court recently had an opportunity to review this judicial struggle to determine the meaning of a COGSA "package" in light of modern maritime technology. In *Yeramex International v. S. S. Tendo*, 1977 A.M.C. 1807 (E.D.Va.1977), *rev'd on other grounds*, 595 F.2d 943 (4th Cir. 1979), the defendant contended, as in this case, that the shipping container, rather than the individual cartons stowed therein, should be considered packages under section 4(5) of COGSA. The plaintiff in *Yeramex* delivered 216 cardboard cartons of cloth goods to Portsmouth Terminals, Inc., for shipment to Paris, France. Thus, in that case, COGSA applied *ex proprio vigore* and not, as here, merely by force of contract. After delivery to the port, the shipowner instructed that the cartons be placed into two large shipping containers owned and selected by the shipowner. The containers were stuffed by the shipowner's agents, who inspected the condition of each of the cartons as they were loaded into the containers.

Although rejecting the defendant's invitation to apply the "functional economics test" announced in *Royal Typewriter Co., supra*, Judge Kellam enumerated several determinative facts, which overlap significantly with those emphasized in *Rosenbruch, supra*. Judge Kellam found significant the fact that the cartons were loaded into the containers at the carrier's, not the shipper's, direction. The containers were owned and selected by the carrier. They were loaded by agents of the carrier, and the carrier inspected the goods as they were loaded into the containers.

Holding that the cartons originally delivered by the shipper, and not the containers supplied by the carrier to expedite the shipment, were the appropriate packages under section 4(5) of COGSA, Judge Kellam left open the question of whether such containers may be found to be COGSA packages where, as here, they were owned, selected, loaded, and sealed by persons other than the carrier, prior to their delivery for shipment.

Similar criteria were applied in another recent decision in this Circuit. In *Common-*

*wealth Petrochemicals, Inc. v. S/S Puerto Rico*, 455 F.Supp. 310 (D.Md.1978), *rev'd on other grounds*, 607 F.2d 322, No. 78–1749 (4th Cir. Sept. 19, 1979), the defendant contended that two transformers attached to a trailer, but not otherwise covered or crated, were COGSA packages. Judge Miller rejected this suggestion, concluding that the essential elements of a COGSA package, as derived from prior cases, are whether:

(1) in the course of preparation for transportation or handling

(2) by the shipper or shipper's agent (or a predecessor of the shipper)

(3) the goods are partially or completely covered or contained by the time delivered or entrusted to the custody of the carrier

(4) in such a way as to preclude facile identification of the exact character of the goods contained therein or of their condition or quantity (including the condition of any outer covering of, or quantity of, smaller units of goods which have been grouped by the shipper into larger individuated units in the course of preparation for transportation or handling).

455 F.Supp. at 321.

■ This review of the principal cases dealing with the issue presented here indicates that the determination whether a particular container is a COGSA package cannot be controlled by a talismanic formula. Rather, that determination rests upon an analysis of the facts presented in each case, informed by the policy which Congress sought to implement by enacting COGSA. For this reason, and for the reasons stated by Judge Beeks in *Matsushita Electrical Corp. v. S. S. Aegis Spirit*, 414 F.Supp. 894, 903–07 (W.D.Wash.1976), the "functional economics test" announced in *Royal Typewriter Co., supra*, presents too narrow a test for determining whether the containers in this case are COGSA packages. The implementation of Congress' purpose cannot rest on so nebulous a factor as the durability of the shipper's original container. Rather, we believe that the application of the following criteria, distilled from these prior cases, more accurately preserves the spirit of COGSA:

(1) Whether the carrier actually possesses superior bargaining strength sufficient to coerce the shipper's agreement to adhesion contract;

(2) Whether the parties treated the container as a single unit in their negotiations, on the documents of contract, and in determining the shipping rate;

(3) Whether the shipper, or at least one other than the carrier, chose to ship the goods in container;

(4) Whether the shipper or carrier procured the container;

(5) Whether the goods were delivered to the carrier previously loaded into the container;

(6) Whether the goods were loaded by the shipper or by the carrier;

(7) Whether the carrier actually observed the contents of the container before it was sealed for shipment;

(8) Whether the container was loaded with the shipper's goods only, and not those of any other shipper;

(9) Whether the markings on the container provided a complete and accurate indication of the contents and their value;

(10) Whether the bill of lading contained any declaration of the nature of the container's contents and their value;

(11) Whether the bill of lading provided the shipper with an adequate opportunity to declare the value of the container and its contents, and to obtain financial protection for any excess value;

(12) Whether the shipper took advantage of this opportunity.

These criteria, while not intended to be exhaustive, are designed to determine whether a particular container in a given situation may reasonably be considered a COGSA package by illuminating the intent of the parties and their actual ability to foresee and allocate the risks of carriage, and thereby to protect their respective in-

terests. They also advance Congress' intent, through COGSA, to eliminate adhesion contract, and to assure that each of the parties to the agreement understands its risks and is provided with an adequate opportunity to protect its interests, without unduly burdening either party or impeding maritime commerce.

■ Applying these criteria to the present case, it is clear that, as between NBC and US Lines, the containers were COGSA packages. For purposes of the agreement between these parties, US Lines must be considered a shipper, regardless of its status as a carrier as to the original shippers. As far as NBC was concerned, the nature and form of the goods to be shipped was completely within the control of US Lines.

There is no indication that US Lines was inferior in bargaining strength to NBC. US Lines' substantial position in maritime commerce belies any such conclusion.

The contract documents clearly reveal the parties' expectations. In the column on the bill of lading headed "No. Packages," the total number of containers is listed on several lines. US Lines does not deny that the bill of lading was completed by its agents. While not conclusive, this is some evidence that US Lines intended to treat the individual containers, and nothing less, as discreet "packages" for purposes of this contract. Similarly, the cargo list contains information only about each of the containers, and not their various contents. Nothing on either of these documents indicates the actual and complete contents of the containers or their value. Indeed, some of the containers were empty; in those instances, nothing except the container could be considered the package. Moreover, NBC charged US Lines, in accordance with its published tariff, a flat rate *per container*, which varied according to the size of the *container*, regardless of its contents. Again, this evidences the parties' intent to treat the containers themselves as the relevant unit for transportation. *See Lucchese v. Malabe Shipping Co.*, 351 F.Supp. 588, 593 (D.P.R. 1972); *United Purveyors, Inc. v. The M/V*

*New Yorker*, 250 F.Supp. 102 (S.D.Fla. 1965).

Regardless of whether US Lines or the original shipper chose to ship these goods in containers, it is apparent that this decision was not made by NBC. The containers were selected and owned by someone other than NBC. Those which contained goods were completely loaded and sealed at the time they were delivered to NBC, and NBC took no part in this loading procedure. At no time did NBC actually observe the contents of the containers, nor were the contents revealed by the containers' markings. In this case, the containers themselves, from NBC's perspective, formed an integral part of this shipment. Thus, the only packages of which NBC could have been aware were the containers themselves.

The bill of lading offered US Lines adequate notice that NBC's liability would be limited to $500 per package by its incorporation of COGSA and express statements of limitation. Similarly, US Lines was given a sufficient opportunity to declare a higher valuation at two places on the face of the bill of lading. At one of these places, it affirmatively indicated its desire not to take advantage of this opportunity by placing three x's in the space provided. The carrier is not obligated to look beyond these documents or the appearance of the containers to determine the value of their contents. *Standard Electrica, supra*, 375 F.2d at 947. *But see, Matsushita Electrical Corp. v. S. S. Aegis Spirit*, 414 F.Supp. 894, 907 (W.D.Wash.1976). The shipper bears the burden of declaring any excess valuation. To state that this opportunity was insufficient because the bill of lading invited a declaration of the value of the containers, and not of "packages," is obviously no more than a convenient sleight of hand, especially in view of the developing case law in this area. US Lines itself has played a part in this development. *See, e. g., Cameco, Inc. v. S. S. American Legion*, 514 F.2d 1291 (2d Cir. 1974) (in which US Lines itself argued that containers are COGSA packages, albeit unsuccessfully in the circumstances presented in that case). Nor

was the additional charge of 10¢ per $100 of excess value unreasonable as a matter of law. *See Pan Am. World Airways v. California Stevedore and Ballast Co.*, 559 F.2d 1173, 1176 (9th Cir. 1977).

Taking these facts together, it is clear that the only packages presented to NBC were the containers themselves. US Lines gave NBC no reasonable indication of their value. The documents support the conclusion that the parties intended that the containers be the nominal units for purposes of both documentation and handling. In view of the adequate opportunity afforded to US Lines to declare a higher value and thereby protect its interests, it is not unreasonable to limit NBC's liability to $500.

Since we hold that each of the containers shipped by US Lines constituted a separate COGSA package, and that NBC's liability with respect to damage to each container and its contents is limited to $500, we need not reach the question whether they each also constituted a "customary freight unit" under that Act and by force of the contract. NBC's motion for partial summary judgment, therefore, is GRANTED.