SMYTHGREYHOUND, A division of Golden Cycle Transportation Corp., et al., Plaintiffs-Appellants,

v.

M/V "EURYGENES," her engines, boilers, etc.

and

Compania Maritima San Basilio, S.A., P.D. Marchessini & Co. (New York) Inc. and Marchessini Lines, Defendants-Appellees.

TRANSATLANTIC MARINE CLAIMS AGENCY INC., Vittoria Assicurazioni, S.P.A., The Agricurazioni Assicurazioni, The Compahnia Italiana Di Sicurata La Pace Assicurazioni E. Riassicurazioni S.P.A. Plaintiffs-Appellants,

v.

M/V "EURYGENES," her engines, boilers, etc.

and

Compania Maritima San Basilio, S.A., P.D. Marchessini & Co. (New York) Inc. and Marchessini Lines, Defendants-Appellees.

No. 22 Docket 80–7809.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1981.

Decided Nov. 18, 1981.

James H. Simonson, New York City (Bigham, Englar, Jones & Houston), New York City, for plaintiffs-appellants Universal Electric Merchandise Co. and KOA Fire and Marine Insurance Co.

Alan Van Praag, New York City (Poles, Tublin, Patestides & Stratakis, Theodore P. Daly, New York City, of counsel), for defendants-appellees.

Before OAKES and MESKILL, Circuit Judges, and BLUMENFELD,* Senior District Judge.

---

* Hon. M. Joseph Blumenfeld, Senior United States District Judge for the District of Connecticut, sitting by designation.

**BLUMENFELD, Senior District Judge:**

This appeal from a judgment of the District Court for the Southern District of New York limiting damages to $500 per container again confronts us with the interpretation of the term "package" as used in section 4(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5). This provides in pertinent part:

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

### The Facts and Proceedings Below

The vessel M/V "Eurygenes" loaded cargo in Japan in August 1973 for carriage to New York and European ports. After sailing from New York, where she had loaded additional cargo, there was a fire on board the vessel which destroyed or damaged a substantial quantity of her cargo.

Two suits were filed in the United States District Court for the Eastern District of New York to recover cargo losses. Included were losses sustained in three shipments made by Universal Electric Merchandise Co. (Universal) consisting of cartons of stereo equipment packed in containers bound for European ports. Subsequently, the suits were transferred to the United States District Court for the Southern District of New York for consolidation with other litigation arising out of the same fire.

A settlement formula was agreed on and embodied in a consent decree. Agreement could not be reached with respect to the three shipments of stereo equipment as to whether the "package" limitation should apply to the containers or to the cartons within the containers. The issue was referred to Magistrate Raby by the district court.

The hearing before the Magistrate revealed that the ship was capable of carrying both containerized and break-bulk (noncontainerized) cargo. Universal chose to use containers because in the past it had lost considerable cargo due to pilferage. The containers were supplied by the carrier, but were loaded and sealed by Universal's freight forwarder, who delivered them to the ship.

The bills of lading specified both the number of containers (e.g., 8 containers) and the number of cartons (e.g., 1500 cartons). The bills of lading incorporated the terms of COGSA, 46 U.S.C. § 1300 et seq. by reference,[1] and specified that they would be construed according to the laws of the United States.[2]

The Magistrate applied the "functional economics" test of Royal Typewriter Co. v. M/V Kulmerland, 483 F.2d 645 (2d Cir. 1973). He found that the cartons in which the stereo equipment was packed were functional and capable of being shipped without being containerized, giving rise to a rebuttable presumption that the parties intended that the cartons should constitute the COGSA "package." The Magistrate then proceeded to examine other relevant factors and concluded that there was a "subjective intent" that the containers, not the cartons, should constitute the COGSA "packages."[3]

---

1. Clause 1 of the bill of lading provides in pertinent part:

   This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights, immunities or limitations or an increase of any of its responsibilities or liabilities under said Act.

2. Clause 20 of the bill of lading provides that:

   This bill of lading shall be construed and the rights of the parties thereunder determined according to the law of the United States.

3. Among the factors relied upon by the Magistrate was the fact that the container was sealed, thereby preventing the carrier from ver-

The district court rejected the Magistrate's finding of "subjective intent" concluding that the parties had not agreed on the definition of the term "package" for purposes of ascertaining liability.[4] The district court, however, applied the $500 limitation to the containers, basing its decision on the fact that the "shipper had the option to ship its goods either break-bulk or by container" and it chose to containerize. The district court effectively held that the shipper's choice of containers instead of break-bulk shipment indicated its acquiescence in the definition of the container as the COGSA "package."

Subsequent to the district court's decision, this court issued its opinion in *Mitsui & Co. Ltd. v. American Export Lines*, 636 F.2d 807 (2nd Cir.). The question on appeal is whether the district court's decision limiting recovery to $500 per container should be upheld in light of our opinion in *Mitsui*. Having determined that it should not, we reverse and remand to the district court for calculation of damages.

### Discussion

In *Mitsui* this court, after reviewing the Congressional policy reflected in section 4(5) of COGSA and the rationale of *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800 (2d Cir. 1971),[5] as well as the problems with the "functional economics" test of *Kulmerland*, held that "generally a container supplied by the carrier is not a COGSA package if its contents and the number of packages or units are disclosed [in the bill

of lading]...." 636 F.2d at 821. Judge Oakes, the author of *Kulmerland* and *Cameco, Inc. v. S.S. American Legion*, 514 F.2d 1291 (2d Cir. 1974), concurred in *Mitsui* saying: "[i]n the realm of container shipping, where the bill of lading specifies the contents, the ship's container should not be deemed a package—even presumptively only—irrespective of how the goods within it are packed." 636 F.2d at 825.

Appellees in the instant case ask us to distinguish *Mitsui* on the basis that here the shipper *chose* to use containers. Because we do not understand the rationale of *Mitsui* to be limited to cases where the shipper is "forced" to use containers, we see no basis for distinguishing *Mitsui* from the instant case.

Appellees' attempt to distinguish this case from *Mitsui* on the basis of Universal's choice of containers implies that the nonexistence of such a choice was a critical factor in *Mitsui* and our previous cases. Appellees contend that the existence of such a choice negates the possibility that the carrier, through its superior bargaining power, coerced the shipper into utilizing containers in order to reduce its liability, and that absent such coercion, the general rule of *Mitsui* does not apply.

While it is true that there is some language in *Leather's Best* and *Mitsui* which indicates a concern with the equality of bargaining strength between the shipper and the carrier, neither of those cases relied solely or even primarily on that ground.[6]

---

ifying its contents. The Magistrate also seems to have relied on the bill of lading itself, since it refers several times to "containers" and only once to "cartons." Lastly, the Magistrate seems to have been influenced by testimony indicating that Universal preferred to ship in containers to cut down on pilferage. He concluded that these factors rebutted the presumption that the parties had agreed on the cartons as COGSA packages.

4.  The district judge recognized that no shipper ever actually intends that its recovery will be limited to $500 per container, or that any carrier, in the absence of an express agreement, intends that the recovery should exceed $500 per container.

5.  *Leather's Best* "has been cited as advancing the hypothesis that a container rarely should be treated as a package. *See Yeramex International v. S.S. Tendo*, 1977 A.M.C. 1807, 1829 (E.D.Va.1977) [*rev'd on other grounds*, 595 F.2d 943 (4th Cir. 1979) ]." *Croft & Scully Co. v. M/V Skulptor Vuchetich*, 508 F.Supp. 670, 678 (S.D.Tex.1981) (footnote omitted).

6.  Judge Friendly, writing in *Leather's Best* indicated his awareness:

    that the standard arguments about the economic power of the carrier and the weak bargaining position of the consignor may be simply a recitation of an ancient shibboleth, at least as applied to shipments of containers fully packed by the shipper.

In both those cases the ships carried only containers, but that fact was not stressed nor specifically relied on in the holdings.

Were appellees correct in their contention that coercion or an unequal bargaining situation was an essential component of *Mitsui*, one would expect to find some discussion of that point in our cases. In our careful review of *Mitsui*, we find only one reference to bargaining power, where Judge Friendly, writing for a unanimous court, observed that one purpose of section 4(5) was to fix a "minimum level of liability . . . to prevent carriers from using their superior bargaining power to compel shippers to agree to provisions reducing their liability to insignificant amounts." *Id.* at 815.[7]

Clearly, the above quotation does not support appellees' argument that *Mitsui* relied on the existence of an unequal bargaining relationship for its holding. Nowhere in *Mitsui* or any of our previous cases, are there specific findings that an unequal bargaining relationship existed or that the shipper was coerced into using a container-only ship.[8] In order to explain the conspicuous absence of findings or discussion of the "choice" (bargaining strength) issue in our previous cases, appellees would argue that such findings were unnecessary because in the context of a container-only ship, a coerced choice could be assumed, since it was the only choice.[9] Such an argument, however, misses the point. Were a finding of an unequal bargaining relation-

---

*Id.* at 815. Notwithstanding this awareness, however, Judge Friendly concluded:

> Still we cannot escape the belief that the purpose of § 4(5) of COGSA was to set a reasonable figure below which the carrier should not be permitted to limit his liability and that "package" is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be "contained."

*Id.* (footnotes omitted).

7. "When COGSA was enacted in 1936, it had as its central purpose the avoidance of adhesion contracts, providing protection for the shipper against the inequality in bargaining power. See Gilmore & Black, Admiralty 125–126 (1957)." *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft*, 375 F.2d 943, 945 (2d Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).

8. In *Kulmerland* the court indicated that the "functional economics" test is applicable in cases "where the shipper has *chosen* the container. . . ." *Id.* at 649 (emphasis added). But nowhere else in the opinion, or in the district court's opinion in the same case, 346 F.Supp. 1019, did the court discuss the type of choice involved, or its relevance, if any, to the issue of inequality of bargaining power. In any event, since *Mitsui* rejected the *Kulmerland* test, this statement is inapplicable to the present case.

9. It could be argued that our holding in *Mitsui*, limiting the application of the general rule to instances where the container is *supplied* by the carrier, supports appellees' position. According to this argument, "supplied" is the functional equivalent of "forced on" and therefore, by limiting our holding to instances where

containers were carrier supplied, we recognized the requirement that coercion or inequality of bargaining power be established. The instant case does not require us to resolve the possible ambiguity of the term "supplied." It is conceded that the carrier did supply the container, and thus this case fits neatly within the *Mitsui* holding. Our analysis of *Mitsui*, however, persuades us that appellees' attempt to equate "supply" with coercion is misplaced. Not only does this argument do violence to the common sense meaning of the words, but as discussed above, there is simply no significant concern with coercion in our cases. That *Mitsui* was limited to instances where the container is supplied by the carrier is easily explained by the fact that that case did not force us to consider the alternative situation. *Kulmerland* is the only case where the container was not supplied by the carrier, but the court did not consider that fact particularly important. 483 F.2d at 647. The decision that the container was the COGSA package turned on the fact that the contents of the container were not functional packages and hence, under the "functional economics" test, could not be COGSA packages. Our cases indicate that the primary variable has been whether the bills of lading disclose the contents of the containers. *See Rosenbruch v. American Export Isbrandtsen Lines, Inc.*, 543 F.2d 967, 970 (2d Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976) (bill of lading did not reflect contents of container except for describing them as "household goods"); *Cameco*, 514 F.2d at 1299 (bill of lading specifically set forth number of cartons of tinned ham). While we do not so decide today, we believe the rationale of *Mitsui* encompasses cases where the container is not carrier supplied, if the bill of lading discloses the contents of the container.

ship necessary to our previous holdings, we would have had to inquire into the question of whether the shipper freely *chose* the all-container ship in the first instance. That no such inquiry took place only indicates that we never considered the existence of unequal bargaining power to be determinative of the meaning to be ascribed to the term "package."

Not only did our previous cases not rest on a finding of coercion or lack of choice, but the attempt to distinguish this case from our precedents on the basis of the shipper's "choice" is unsound. In all our previous cases, it could have been argued that the shippers *chose* to use containers, inasmuch as they contracted with a ship which they knew carried only containers. Presumably, the shippers could have *chosen* to send their cargo break-bulk by contracting with a ship which handled cargo in that manner. The choice of containers in the context of a mixed-cargo carrier (break-bulk and containers) is no different from the initial choice to ship, via an all-container ship. Both choices may reflect the shipper's desire to utilize containers for a varie-

ty of reasons.[10] Appellees' argument implies that whenever a shipper affirmatively prefers to use containers for its own convenience,[11] then it must be held to have agreed that the container will be the COGSA "package." Because *Mitsui* and our previous cases clearly do not support such a proposition, we reject appellees' argument.

*Mitsui* and its predecessors were not primarily concerned with the actual or potential inequality of bargaining power between shippers and carriers. They were concerned with interpreting section 4(5) of COGSA to give effect to the congressional purpose of establishing a reasonable *minimum* level of liability. See *Mitsui*, 636 F.2d at 815; *Leather's Best*, 451 F.2d at 815. To give effect to this purpose, the courts must "take a critical look at any proposed construction of [section 4(5)] that would reduce a carrier's liability below reasonable limits." *Mitsui*, 636 F.2d at 815.

Appellees argue that we need not concern ourselves with the congressional policy underlying COGSA, because the shipment involved in this case was from Japan to European ports, and therefore the statute was

**10.** Or they may simply reflect a lack of concern about whether the cargo was shipped break-bulk or containerized and simply a desire to ship as expeditiously as possible.

**11.** Appellees here and the district court and Magistrate below placed great significance on the fact that the shipper chose to use containers for its own convenience. We note, however, that both parties achieve certain benefits from the use of containers. See *Kulmerland*, 483 F.2d at 647 n.3; *Leather's Best*, 451 F.2d at 815–16 n.19. Judge Beeks, "an experienced admiralty lawyer before his appointment to the bench," *Mitsui*, 636 F.2d at 819–20, observed in *Matsushita Electric Corporation of America v. S.S. Aegis Spirit*, 414 F.Supp. 894 (W.D.Wash. 1976) that:

> the carrier enjoys corresponding benefits from containerized cargo carriage which are entirely neglected in the "functional economics" test. Only the shipper's pecuniary advantage is seized upon and, in effect, neutralized by this test.

*Id.* at 904. See generally, Tombari, *Trends in Oceanborne Containerization and its Implications for the U.S. Liner Industry*, 10 Journal of Maritime Law and Commerce (JML&C) 311 (1979); Simon, *More on the Law of Shipping Containers*, 6 JML&C 603 (1975); Simon, *The*

*Law of Shipping Containers*, 5 JML&C 507, 510–15 (1974).

A recent district court decision, while adopting a complex multi-factor analysis, concluded that the economic benefits of containerization are equally distributed.

> Somewhat akin to the conflict apparent in the congressional intent analyses is the disagreement among courts and commentators, and between the parties herein, with regard to whether the carrier or the shipper benefits more from the use of containers. Much as the realities of the 1936 maritime conditions are persuasive of an adoption of the compromise purpose of COGSA, the realities of current maritime cargo transportation practices require the Court to conclude that containerization is beneficial, and most likely equally so, to both the shipper and the carrier. Accordingly, the Court determines that the economic benefits which accrue to one side or the other by the use of containers are to be accorded little weight in the final resolution of, or the method of analysis, used in the package issue.

*Croft & Scully Co. v. M/V Skulptor Vuchetich*, 508 F.Supp. at 681 n.11 (citations omitted).

not applicable *ex proprio vigore*.[12] Appellees argue that since the policy concerns of COGSA are inapplicable, we should look to the intent of the parties to establish the meaning of the term "package." Our attention is directed to *Pannell v. United States Lines Co.*, 263 F.2d 497 (2d Cir. 1959), which held that "when COGSA does not apply *ex proprio vigore*, effect should be given to the parties' definition of package even if that definition is contrary to that which would control if COGSA were directly applicable." *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico*, 607 F.2d 322, 325 (4th Cir. 1979).

Were this a case where the parties had defined what "package" means in the bills of lading, we would find appellees' argument persuasive. This case, however, is unlike *Pannell* and *Commonwealth Petrochemicals* precisely because the bills of lading do not define "package." Appellees state again and again that the bills of lading clearly indicate Universal's assent to the definition of "package" as the containers.[13] We agree with Judge Goettel, however, that the bills of lading quite obviously do not support such a contention. On the contrary, on their face the bills of lading reflect the lack of agreement, insofar as they refer to both "containers" and "cartons." We are not dealing here with a case where the parties' intent is clear and unambiguous. We are thus forced to look elsewhere for the definition of "package." The bills of lading incorporate COGSA and specifically make provision for interpretation according to the laws of the United States.[14] It is therefore appropriate to follow prevailing case law in this circuit in our interpretation of the term "package."

It is undeniable that *Mitsui*'s holding that generally a carrier-supplied container is not a COGSA package if its contents are disclosed is applicable to the instant case. Appellees, however, seek to distinguish this case from *Mitsui* on several grounds. First, appellees argue that where, as here, the shipper loaded and sealed the container, the carrier should not be held to the shipper's self-serving description of its contents for the purposes of the package limitation. The short response to this argument is that the same situation was present in *Mitsui*, and this court did not consider it significant.

In *Mitsui* the containers "were packed and sealed by the shippers at their own premises and were intended to be forwarded, unopened, to the consignees at their place of business in Japan." *Id.* at 811. There is no mention of the carrier or its agent checking the contents of the containers, and no indication that the carrier's failure to verify the container's contents was considered significant. In *Leather's Best* a truck driver did watch the loading of the container and issued a receipt, 451 F.2d at 804 and n.2, but no special significance was attached to that fact. Appellees would have us seize on this comment in *Leather's Best* and construct a rule that the contents of the container cannot be the COGSA package where the carrier (or its agent) has not verified the contents of the container. *Mitsui* obviously does not support such a rule, and we decline to adopt it in this case.[15]

---

**12.** COGSA § 1300 provides that:

Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter.

**13.** Appellees' reliance on the "intent" test of *Cameco*, 514 F.2d at 1297, and *Kulmerland*, 483 F.2d at 649, is equally misplaced, because the bills of lading and the external evidence do not indicate that the parties agreed on the meaning of the term "package." In addition, it is unclear whether those cases have any continuing validity in light of *Mitsui*'s rejection of the "functional economics" test. See Judge Beeks' discussion in *Matsushita Electric Corporation v. S.S. Aegis Spirit*, 414 F.Supp. 894, 904–05 (W.D.Wash.1976) about the difficulty inherent in making the intent of the parties the touchstone in determining COGSA liability.

**14.** *See* notes 1 and 2, *supra*.

**15.** We also note the possibility that the carrier could have opened the cargo to verify its contents. Clause 15 of the bill of lading states in pertinent part:

Appellees' second argument is that because the shipper can protect himself by declaring the full value of the goods and paying a higher tariff, the limitation clause should not be strictly construed against the carrier. Judge Friendly rejected this argument in *Mitsui*:

> We find scant force in the argument that there is no need for a fairly strict construction of the package provision since a shipper can always protect himself by declaring a higher value and paying a higher rate. Although this was doubtless expected at the time of the drafting of the Hague Rules, see Diplock, [*Conventions and Morals—Limitation Clauses in International Maritime Conventions*, 1 Journal of Maritime Law and Commerce 525 (1970)] at 529, "[t]he option to declare a higher value is practically never exercised." One obvious reason is that a declaration of value and payment of higher ad valorem rates benefits the shipper or consignee only when the carrier is liable. Shippers, consignees and persons financing maritime transactions insist on insurance that will protect against all risks of shipment, including loss or damage attributable to such causes as acts of the crew, fire, perils of the sea, not just those risks for which recovery may be had under COGSA. As Lord Diplock has explained:

> [T]he increase over the standard freight rates which the carrier requires for accepting the higher liability is greater than the reduction in the insurance premium which the cargo insurer is prepared to offer for the prospect of recovering a higher amount from the carrier or his P. and I. insurer, in the event of a loss for which the shipper [sic] is liable.... There are so many risks covered by the cargo insurance policy that the prospect of recovery in respect of one of them has little influence in fixing the premium, whereas the risk of liability to the cargo-owner is one of the principal risks insured under the carrier's P. and I. policy, and his maximum liability is a significant factor in the rates of premiums.

Diplock, *supra*, at 529.

*Id.* at 815–16 n.9.

[Mitsui] adopted a general rule that where the bill of lading discloses the contents of the container, then the container is not the COGSA package.[16] This general rule both adheres to the congressional purpose behind the statute and meets the goal of international uniformity. *See Mitsui*, 636 F.2d at 821. Appellees argue that this seemingly straightforward pronouncement is not really what it appears to be. Instead, appellees would have us apply something similar to the twelve criteria analysis employed by Judge Clarke in *Complaint of Norfolk, Baltimore & Carolina Line, Inc.*, 478 F.Supp. 383 (E.D.Va.1979).[17]

---

Freight may be calculated on the basis of the particulars of the goods furnished by the Shipper herein but the Carrier may at any time open the packages and examine, weigh, measure and value the goods.

Whatever dangers of fraud exists may easily be prevented by having the carrier check the loading of the container as in *Leather's Best*. This would be neither difficult nor expensive. *See Cameco*, 514 F.2d at 1299 & n.6.

**16.** *Mitsui* did not cover the situation in which the bill of lading does not show how many separate packages there are. *See id.* at 821 n.18.

**17.** The twelve criteria are:

(1) Whether the carrier actually possesses superior bargaining strength sufficient to coerce the shipper's agreement to adhesion contract;

(2) Whether the parties treated the container as a single unit in their negotiations, on the documents of contract, and in determining the shipping rate;

(3) Whether the shipper, or at least one other than the carrier, chose to ship the goods in containers;

(4) Whether the shipper or carrier procured the container;

(5) Whether the goods were delivered to the carrier previously loaded into the container;

(6) Whether the goods were loaded by the shipper or by the carrier;

(7) Whether the carrier actually observed the contents of the container before it was sealed for shipment;

(8) Whether the container was loaded with the shipper's goods only, and not those of any other shipper;

We decline to adopt Judge Clarke's analysis because we do not believe it is a "common sense test" which will help "avoid the pains of litigation."[18] *See Kulmerland*, 483 F.2d at 649 (quoting *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft*, 375 F.2d 943, 945 (2d Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967)). Judge Clarke's analysis is essentially another means for arriving at the intent of the parties where such intent is not clear from the bill of lading. *Mitsui* and *Leather's Best* rejected a complex intent analysis in favor of a clear rule that where the contents of the container are disclosed in the bill of lading then the container is not the COGSA package.[19] The rule has the advantage of being a bright line, achieving "certainty" but not "at the expense of legislative policy and equity...." *Mitsui*, 636 F.2d at 825 (Oakes, J., concurring) (quoting Judge Feinberg's statement in dissent in *Standard Electrica*, 375 F.2d at 948). *Mitsui* and our decision today will put carrier interests on notice that the container will not be considered the COGSA "package" where the bill of lading discloses the contents of the container.[20] *Mitsui's* holding is consistent with the congressional purpose of establishing a reasonable minimum level of liability. And nothing in appellees' argument suggests that *Mitsui* is inequitable to carrier interests.

*Mitsui's* general rule does not resolve all the questions in these "package" cases. It merely resolves the question of whether the container is the COGSA "package." Having determined that it is not, we must consider whether this is a "case of goods not shipped in packages," in which case the $500 limit applies to the "customary freight unit." COGSA § 4(5), 46 U.S.C. § 1304(5). *See Mitsui*, 636 F.2d at 818. In the instant case, there is no evidence which leads us to conclude that the cartons are not "packages" for COGSA purposes. It is conceded that these same cartons were shipped break-bulk. The carrier has not argued that the cartons are not "packages" within the statutory language, nor that some other customary freight unit is more appropriate. We therefore hold that the $500 per package limit on liability applies to the stereo cartons in this case.

In conclusion, we hold that our decision in *Mitsui* applies to this case, regardless of the fact that the shipper had a choice of break-bulk or container shipment. In view of *Mitsui*, it was error to conclude that the shipper's choice indicated its acquiescence in the definition of the "package" as the container. Accordingly, we are constrained to reverse and remand to the district court for calculation of damages in keeping with this opinion.

(9) Whether the markings on the container provided a complete and accurate indication of the contents and their value;
(10) Whether the bill of lading contained any declaration of the nature of the container's contents and their value;
(11) Whether the bill of lading provided the shipper with an adequate opportunity to declare the value of the container and its contents, and to obtain financial protection for any excess value;
(12) Whether the shipper took advantage of this opportunity.
*Complaint of Norfolk, Baltimore & Carolina Line, Inc.*, 478 F.Supp. at 392.
18. We do not take Judge Friendly's favorable reference to Judge Clarke's opinion as an endorsement of the twelve criteria analysis. Rather, Judge Clarke was cited with approval because of his rejection of the "functional economics" test. *See Mitsui*, 636 F.2d at 820. A recent district court case which adopts Judge Clarke's analysis notes that it "provides little

comfort to those who seek some form of short cut to predictability of result with regard to this [package] issue." *Croft & Scully Co. v. M/V Skulptor Vuchetich*, 508 F.Supp. at 684.

19. We do not decide whether an intent analysis similar to Judge Clarke's would be appropriate where the contents of the container are not disclosed in the bill of lading. *Mitsui* did not deal with that situation. *See* note 16, *supra*.

20. This does not mean that the parties cannot agree between themselves that the container will be the COGSA "package," especially in cases where COGSA does not apply *ex proprio vigore*. Rather, we hold today that in the absence of clear and unambiguous language indicating agreement on the definition of "package," then we will conclusively presume that the container is *not* the package where the bill of lading discloses the container's contents.