AUSTRACAN (U.S.A.) INC., Plaintiff,

v.

NEPTUNE ORIENT LINES, LTD., Defendant and Third-Party Plaintiff,

v.

CONSOLIDATED RAIL CORP., Third-Party Defendant.

No. 81 Civ. 4755–CSH.

United States District Court, S.D. New York.

April 23, 1985.

On Motions to Reargue and Amend June 7, 1985.

McHugh, Leonard & O'Conor, New York City, for plaintiff; Douglas A. Franklin, New York City, of counsel.

Walker & Corsa, New York City, for Neptune Orient Lines, Ltd.

Michael J. Siris, New York City, for Consol. Rail Corp.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

In this admiralty action alleging partial loss of a shipment of canned tuna, plaintiff consignee moves for summary judgment pursuant to Rule 56, F.R.Civ.P., against defendant and third-party plaintiff ocean carrier.

Many of the relevant facts are not disputed. Plaintiff Austracan (U.S.A.) Inc. (hereinafter "Austracan"), whose office is in New York City, is an importer of canned goods. In October 1980, Austracan contracted to purchase a shipment of 1,350 cartons of tuna from Judric Seafoods Company of Hong Kong. At the same time, Austracan contracted to sell these 1,350 cartons to Quality Foods Corporation of the Virgin Islands, at a price of $46.00 per carton, F.O.B. New York.

The shipment moved by sea from Manila, the Philippines (where it was shipped by Judric Canning Corporation) to Oakland, California, and thence by rail from Oakland to Port Elizabeth, New Jersey. The ocean carrier was defendant and third-party plaintiff Neptune Orient Lines, Ltd. ("Neptune"), whose vessel NEPTUNE TOPAZ performed the voyage. The rail transportation from Oakland to Port Elizabeth was performed by third-party defendant Consolidated Rail Corp. ("Conrail"). Neptune tendered defense of the action to Conrail,

which has thereafter carried the laboring oar of the defense, including briefing and arguing the case on behalf of Neptune.

Neptune's agent at Manila was Overseas Agency Services ("OAS"). Under date of October 25, 1980, and on Neptune's behalf, OAS issued a Combined Transport Bill of Lading which, under the printed caption "Description of Packages and Goods," contained this typed material:

| PIER–TO–HOUSE | "SHIPPER'S WEIGHT" |
|---|---|
| 1 CONTAINER (20 FAR) SAID TO CONTAIN 1,350 CARTONS PACKED 6/66.5 OZ. TINS PER CARTON OF CHUNK LIGHT TUNA IN BRINE PRODUCT OF THE PHILIPPINES QUALITY BRAND LABEL | 18,000 KLS 25.65 CBM |
| | LOADED ON BOARD NEPTUNE TOPAZ V–24S OCTOBER 25, 1980 |
| SHIPPER'S LOAD COUNT AND SEAL | |

Under its contract with Judric, Austracan set up a letter of credit in Judric's favor, with payment to be made by the bank upon presentation of specified documents, including an on board negotiable bill of lading. Following loading of the cargo on the NEPTUNE TOPAZ, these documents were in fact presented, and payment made under the letter of credit. The shipping documents were then forwarded to Austracan. No one at Austracan had an opportunity to examine the bill of lading before payment under the letter of credit was made.

Austracan contends that the phrase "pier-to-house" appearing on the bill of lading is generally understood in the field of ocean carriage to mean that the ocean carrier receives the goods in the form of cartons, or pallets, or some other "break-bulk" form. The ocean carrier then loads or "stuffs" the packages thus received into a container for ocean carriage. At the port of destination, the ocean carrier delivers the container without unloading or "stripping" it, and it is delivered to the consignee's "house," that is, the consignee unloads or "strips" the container at its premises. Affidavit of William McCuen, in support of plaintiff's motion, at ¶ 4. In the case at bar, the designated place of delivery was "New York," at the end of the combined sea/rail transportation. Neptune, as ocean carrier, remained responsible under the bill of lading contract for the rail portion of the combined transport. Austracan was the consignee under the bill of lading.

Conrail contends for a different meaning of the notation of "pier-to-house" carriage. According to Conrail, the notation means that the carrier's customer (shipper or consignee) arranges for delivery of the container to the ocean carrier's facility at the port of loading, and the carrier transports the container to the customer's warehouse or facility at the port of discharge. Under Conrail's construction of the phrase, the shipper stuffs and seals the container, and then delivers it to the ocean carrier's facility for carriage to the consignee's "house." Affidavit of Daniel S. Gonzales, in opposition to plaintiff's motion, at ¶ 6.

Whether these conflicting affidavits create a "genuine issue" as to a "material fact," Rule 56(c), F.R.Civ.P., I consider infra. But it appears to be common ground that, in fact, the shipment in question was stuffed into a container and sealed at the premises of the shipper, Judric Canning Corporation, and delivered to Neptune's Manila pier in that condition.

Defendants offer evidence, not contradicted on this motion, that the dock facility at Manila where OAS received the container had no scales or other equipment for weighing containers. Gonzales affidavit at ¶ 8.

There is evidence that on December 1, 1980, the container holding the cartons of tuna had arrived at Conrail's facility in Port Elizabeth, and was examined by a

United States Customs Service inspector on that date. Affidavit of Benjamin C. Jefferson, Director of the Newark, N.J. area of United States Customs, in opposition to motion, and attached letter report of January 29, 1982. On December 2, Emanuel Cheatham, a truck driver employed by E.R.A. Trucking Company Inc., was directed to go to Port Elizabeth with a tractor and pick up the container for transportation to a warehouse at Pier 40, North River, for delivery of its contents into the warehouse. When Cheatham found the container, he saw that it had no seal upon it. Cheatham brought this to the attention of the Customs Inspector and Conrail representatives at the terminal. The Customs Inspector "looked inside the container," Cheatham affidavit at ¶ 6, and a new seal, Conrail No. T24446, was affixed to the container. Cheatham then drove the container directly to the Gordon Warehouse on Pier 40. The area of Pier 40 where the Gordon Warehouse and E.R.A. Trucking's offices are located is surrounded by a security fence, manned at all times by security guards. Cheatham left the container, still sealed, in that secured enclosure, to be unloaded by Gordon Warehouse personnel subsequently.

Gordon's warehouse is a bonded customs warehouse. Accordingly the Customs Service maintains a Customs Inspector on the premises during business hours. On December 4, warehouse personnel unloaded the container, under the supervision of Customs Inspector Paul Fliegel. Fliegel's duty was to note the condition of the seal on the container before unloading, and to verify the quantity of cargo imported into the warehouse. Fliegel's reports, attached as exhibits to the affidavit of Michael Cilenza, the warehouse manager, reflect that the Conrail seal was intact on December 4, and that upon unloading it was discovered that the container was 258 cartons short of the bill of lading quantity of 1,350 cartons.

In these circumstances, plaintiff claims for the loss of 258 cartons at the resale value of $46 per carton.

## DISCUSSION

This shipment is governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300–1315 (1976). Under the statute, a consignee such as Austracan establishes a *prima facie* case for recovery from the carrier by proving (1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition. When the consignee proves its *prima facie* case, the burden shifts to the carrier to show that the loss or damage falls within one of the COGSA exceptions to liability set forth in 46 U.S.C. § 1304(2) (1976). *Westway Coffee Corp. v. M.V. NETUNO*, 675 F.2d 30, 32 (2d Cir.1982), and cases cited.

Here we deal with a case not of damage but of partial loss. Austracan's *prima facie* case would consist of proof of delivery of a specified number of cartons to the carrier, followed by an outturn of less than that number.

The first question is therefore whether a genuine issue requiring trial exists as to that unquestionably material fact, the number of cartons that were placed in this container.

Austracan contends that the numbers of cartons stated in the bill of lading constitute "prima facie evidence of the receipt by the carrier of the goods as therein described," 46 U.S.C. § 1303(4); that it was entitled to rely on the numbers of cartons stated in the bill of lading, which was negotiated to it in consideration of payment under the letter of credit; and that the carrier is estopped from claiming that the missing cartons of tuna were not in the container when Neptune took possession of them.

Neptune contends that plaintiff has failed to prove delivery of the full number of cartons to the carrier, and thereby has failed to establish a *prima facie* case. Neptune further contends that the estoppel theory does not apply to a case involving sealed containers.

COGSA provides at §§ 1303(3) and (4), in pertinent part:

"(3) After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—* * *

"(b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.

"(c) The apparent order and condition of the goods: *Provided,* That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

"(4) Such a bill of lading shall be prima facie evidence of the receipt of the carrier of the goods as therein described in accordance with paragraphs (3)(a), (b), and (c), of this section:...."

■ Under § 1303(4), the bill of lading in this case constitutes *prima facie* evidence of Neptune's receipt of 1,350 cartons. Neptune attempts to avoid that statutory effect by pointing to the typed phrases "said to contain" and "shipper's load count and seal." Prior cases uniformly reject that effort. "It has been long established that the weight listed on a bill of lading is *prima facie* proof of receipt by the carrier of that weight regardless of attempted reservations like 'said to weigh,' 'shipper's load and count,' and 'contents of packages are shipper's declaration.'" *Westway Coffee Corp. v. M.V. NETUNO, supra,* at 675 F.2d 32 (citing cases).

In *Westway* the plaintiff quantified its claim on the basis of lost weight, while Austracan does so on the basis of lost numbers of packages; but the statutory scheme does not distinguish between the two. *Spanish American Skin Company v. The Ferngulf,* 242 F.2d 551, 554 (2d Cir.1957) ("... the recitation of both number of bundles and weight in the bill of lading furnished prima facie proof of re-

ceipt by the carrier of skins of both the number and weight recited...."").

Neptune points out that the disclaimers or reservations rejected by the courts in certain cases appeared in fine print, whereas those at bar are typed. I am cited to no case holding that this makes any difference, and I see no reason why it should. The effect of the owner's recitations of numbers and weights in the bill of lading, and the method available to the carrier for avoiding liability for false information given by the shipper, are explicitly set forth in the statute. Phrases such as "said to contain" avail the carrier nothing, whether they are in fine print, typing, or medieval calligraphy.

■ Prior cases are equally clear concerning the carrier's option if, as to the quantity or weight stated by the shipper, "he has reasonable ground for suspecting" the accuracy, or "he has had no reasonable means of checking." The carrier must, in those circumstances, refrain from listing quantity or weight in the bill of lading, or bear the consequences. *Westway Coffee Corp., supra,* states the rule at 33:

"Once the carrier lists the weight of the goods (which normally will be readily verifiable by the carrier), he represents that he has no reasonable ground for suspecting that the weight of the goods actually received varies from the listed weight and that he has reasonable means of checking the weight, 46 U.S.C. § 1303(3)(c) (1976). This is enough for a *prima facie* showing of receipt of the listed weight. 46 U.S.C. § 1303(4) (1976)."

Most prior authority on these points deals with breakbulk cargoes. Containers, the product of a new technology, do not always fit readily into concepts fashioned by COGSA in 1936. *Westway Coffee Corp.* was a container case; but, as noted, the cargo plaintiff sued on the basis of lost weight; and, in the Second Circuit's view, weight "will normally be readily available by the carrier," *id.* at 33, even if the cargo is containerized. However, in the case at bar, plaintiff sues for a specific number of

lost cartons; and in *Royal Typewriter Co. v. M/V Kulmerland,* 483 F.2d 645, 647 n. 4 (2d Cir.1973), the court said:

> "When packages are stowed in a container which is then locked and sealed, as is the practice, the number of packages is not verifiable. Under COGSA, 46 U.S.C. § 1303(3)(c), the bill of lading need not show a quantity which the carrier 'has had no reasonable means of checking.'"

This observation was perhaps not necessary to the decision, which held that in the circumstances a container constituted a "package" for purposes of the $500 limitation in section 1304(5).

The ocean carrier in *Westway Coffee Corp.* argued to the district court that it could not, as a practical matter, open the containers and inspect their contents. Judge Sand rejected the argument as irrelevant "because this case involves the presence of the missing cargo, not its condition, and because defendant had the alternative of weighing the containers to verify that they contained the consigned cargo." 528 F.Supp. 113 (S.D.N.Y.1981) at 117 n. 5. Accepting in the instant case Neptune's statement that it lacked facilities to weigh containers at its Manila pier, there is authority for the proposition that section 1303(3)(c) required the carrier in those circumstances to refrain from including weights in the bill of lading. *Woodhouse Drake & Carey (Trading) Inc. v. S.S. "Hellenic Challenger,"* 472 F.Supp. 31, 33–34 (S.D.N.Y.1979) (Weinfeld, J.), cited with approval by the Second Circuit in *Westway Coffee Corp., supra,* at 32.

But the plaintiff in *Woodhouse,* like plaintiff in *Westway,* sued for lost weight, not lost items; and the cargo in *Woodhouse* was not containerized. The case at bar raises practical questions which, to my knowledge, have not been previously confronted. Within the scheme of COGSA, what is the ocean carrier's obligation when faced with a sealed, locked container whose contents he cannot examine, presented for shipment at a pier lacking facilities to weigh it?

Plaintiff's position, I gather, is that the carrier cannot under established authority save himself with phrases such as "said to contain"; and that his only option in such circumstances is to refuse to describe the shipment either by quantity or weight in the bill of lading. What effect so noncommittal a document would have on its utility as a negotiable instrument of title in commerce is problematical. Indeed, it is a problem recognized and left undecided by the Ninth Circuit in the frequently cited case of *Portland Fish Co. v. States Steamship Co.,* 510 F.2d 628, 634 (9th Cir.1974) (on rehearing):

> "On rehearing, several ocean carriers have moved for leave to file briefs *amicus curiae.* However, it appears that the issues sought to be raised in such briefs concern the possible effect of our decision on the ocean transportation of containerized cargoes—those in sealed 'packages' not normally opened and inspected by the carrier at the time he issues a bill of lading. The motions are denied. Since the case before us involves solely a bulk shipment subject to piece count, the questions thus raised will have to wait another day for decision. We intimate no opinion on them."

The issues are interesting and important; but I need not plumb these uncharted waters to their depths because OAS, Neptune's agent at the loading port, typed another phrase on the bill of lading. It is the phrase which leads all the rest. It says: "pier-to-house."

I find on the evidence before me that "pier-to-house" has a recognized trade meaning. It is that meaning set forth in the McCuen affidavit: the ocean carrier receives the goods in breakbulk form at the pier, and loads or "stuffs" the packages thus received into a container for ocean carriage.

This is the definition appearing in a Government publication, *A Shipper's Guide to Stowage of Cargo in Marine Containers,* U.S. Department of Transportation, Maritime Administration (1982). The booklet acknowledges the assistance of

a formidable number of leading industry representatives. I do not hesitate to take judicial notice of its contents under Rule 201(b)(2), F.R.Evid. A "pier-to-house" shipment is described as follows (at p. 140):

"A shipment which is loaded into a container at the pier or terminal then exported directly to the consignee's designated area for unloading."

A "house-to-pier" shipment is described (*Id.* at p. 136):

"Designates a cargo which is loaded into a container by the shipper in an area under his supervision. When the cargo is exported, it is unloaded at the foreign pier destination."

The phrase "house-to-house" is defined by referring the reader to "door-to-door," which is defined as:

"Through transportation of a container and its contents from consignor to consignee." *Id.* at pp. 134, 136.

These commercial definitions have begun to find their way into caselaw. In *Smythgreyhound v. M.V. "Eurygenes,"* 1980 A.M.C. 2270 (S.D.N.Y.1980) (not officially reported), *rev'd on other grounds*, 666 F.2d 746 (2d Cir.1981), Judge Goettel had occasion to state at 2274:

"This is particularly true where the shipment is 'house to house,' that is, where the goods are packed by the shipper in his factory or warehouse, carried overland by truck or rail, placed aboard a ship, unloaded at the port of destination, and then carried overland by rail or truck to the consignee, where the container is opened."

In *Koppers Co. Inc. v. S.S. "Defiance,"* 542 F.Supp. 1356, 1358–59 (D.Md.1982), Judge Kaufman gives this discussion:

"On the face of the bill of lading there was stamped the designation 'Pier to Pier Traffic.' That designation requires handling of the cargo by the carrier before its loading on and after its discharge from the vessel, and differs from the designation 'House to House Traffic' on a bill of lading. The latter calls for the shipper to pack the container at the shipper's facility and to deliver the packed container to the carrier at the port of departure for further loading aboard a vessel and shipment to the port of destination. At such port, the container, shipped as 'House to House Traffic,' is unloaded from the vessel and taken to a container yard, from which it is picked up by an outside trucking company for hauling to the ultimate consignee. By way of contrast, under the 'Pier to Pier' designation, the cargo itself is delivered to the carrier at the port of departure, where it is put into a container, loaded onto a vessel and shipped to its port of destination. On arrival at such port, the container is unloaded from the vessel and taken to the container yard, and from the container yard is taken to a facility within the terminal (such as Shed No. 4) to be 'stripped.' The process of stripping involves the removal of the cargo from the container. The cargo is then repackaged, if necessary, and loaded on one or more trucks for the balance of its journey to the ultimate consignee. An additional fee over and above that charged for 'House to House Traffic' is paid to the carrier by the shipper for a 'Pier to Pier' shipment, to cover the cost of the additional services to be rendered."

Footnote 2 accompanying this text states:

"One can also seemingly arrange for different combinations of preloading and post-discharge services, known as 'Pier to House' or 'House to Pier.'"

I am aware of the affidavit offered by Mr. Gonzales of OAS to the effect that "pier-to-house" carriage means that the "shipper stuffed and sealed this container and delivered it to [the ocean carrier's] facility for carriage to consignee's 'house.'" His suggested definition flies in the face of all authority. When the shipper stuffs and seals the container prior to delivery to the ocean carrier, the first word that appears in the hyphenated, modal description is "house." When the ocean carrier receives a breakbulk cargo and stuffs it into a container, the first word that appears is "pier." On this record, I can give no credence to the self-serving definition

contained in the Gonzales affidavit. His affidavit does not give rise to a *genuine* issue of fact requiring trial.

Appearance of the phrase "pier-to-house" on the bill of lading in suit is significant, notwithstanding the apparently conceded fact that this container was stuffed at the shipper's "house," and not at Neptune's "pier." Austracan, the consignee and purchaser in good faith of the bill of lading, knew nothing of this. *Cf. American Trading Co. v. The Harry Culbreath*, 187 F.2d 310, 312 (2d Cir.1951). What this bill of lading said to someone in Austracan's position was that Neptune received 1,350 cartons of tuna at its Manila pier, stuffed them into a container for ocean shipment, and then sealed the container. If that is not an accurate description of what occurred, Neptune has no one but its agent, OAS, to thank.

Furthermore, under familiar authority Neptune is estopped from denying the contents of the bill of lading. *Demsey & Associates v. S.S. "Sea Star,"* 461 F.2d 1009, 1015 (2d Cir.1972); *Elgie & Co. v. S.S. "S.A. Nederburg,"* 599 F.2d 1177, 1180 n. 6 (2d Cir.1979); *Portland Fish Co. v. States Steamship Co., supra,* at 510 F.2d 631, and cases cited.

■ On the facts of this case, I hold that Austracan has made the requisite *prima facie* proof of delivery of 1,350 cartons of tuna to Neptune; and that Neptune is estopped from denying the delivery of that quantity into its hands for carriage.[1]

■ Turning now to events at the port of discharge, I hold that Austracan is also

entitled to a finding at this time that 258 cartons disappeared while the shipment was in the carrier's custody, that is to say, during the combined sea/rail transport. The original seal was observed to be missing at the Conrail yard. The resealing of the container at that yard, its prompt removal by truck to a secured warehouse facility, and the intact condition of the Conrail seal when counting of the cartons occurred two days later, precludes any possibility of tampering and pilferage after the consignee's trucker received the container from the carrier's custody.

Neptune seeks to promote a triable issue of fact on this aspect of the case by means of the affidavit of Mr. Jefferson, the United States Customs Director for Newark. The difficulty is that, on the key issue, Jefferson's affidavit constitutes inadmissible hearsay. Jefferson consulted Customs' "records" concerning the container in question. Jefferson's letter of January 29, 1982, incorporated in his affidavit, recites in pertinent part:

"The examining Inspector noted on entry WH 81–1073996 that no seal was affixed to the container and then performed his wharf sample examination. The examining officer noted no discrepancies at this time and hence did not file any discrepancy or theft reports. Upon completion of his examination, the Customs Inspector released the container to the bonded cartman. The container was then resealed with Conrail seal T24446."

■ Rule 56(e) requires that affidavits "shall be made on personal knowledge,

---

**1.** I leave for another day the questions that would arise if the carrier of a shipper-stuffed and sealed container does not erroneously describe it in a negotiable bill of lading as a "pier-to-house" shipment; or if the plaintiff is the shipper, who knows the description is wrong. Such circumstances, if they arise in future container cases, may arguably cause phrases such as "said to contain" or "said to weigh" to rise like Lazarus from the death of adverse precedent. But this is not such a case.

Neptune also relies on the Powerene Act, 49 U.S.C. § 101, which relieves the carrier from the conclusive effect of quantities or weights stated in bills of lading when such disclaimers are

used. But the Powerene Act by its terms applies only to shipments originating in the United States. It has been repeatedly held that the Powerene Act does not apply to shipments originating outside the United States. As to such shipments, the carrier is bound by its representations concerning on-board quantities. *Elgie & Co. v. S.S. "S.A. Nederburg," supra,* at 1180; *Portland Fish Co. v. States Steamship Co., supra,* at 631–32; Sand, D.J., in *Westway Coffee Corp., supra,* at 117 n. 7. *See also, T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour,* 629 F.2d 338, 372 (5th Cir.1980). Defendants argue that the Second Circuit decided *Elgie* wrongly. They must make that argument there, not here.

shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Jefferson cannot testify as to what the unnamed Customs Inspector at the Conrail facility actually did. But it is important to know what he actually did, because unless during the course of what Jefferson describes as a "wharf sample examination" (which is not defined, but sounds less than thorough) the Inspector performed a careful and complete count of all cartons in the container, he would not be in a position to testify that all 1,350 cartons were in the container when it left the carrier's custody.

Defendants offer no affidavit from the Inspector himself. However, plaintiff offers the affidavit of Cheatham, the truck driver, who states on personal knowledge that it is the practice where a seal is found to be missing (which was unquestionably the fact here) for the Customs Inspector to note that fact; make a "brief inspection" of the container, and reseal it. Affidavit at ¶ 5. Cheatham says that on the occasion in question, the Customs Inspector "looked inside the container" and then affixed a new seal. *Id.* at ¶ 6. I draw the inference that the Customs Inspector did not count all the cartons in the container during this "brief inspection." There is no admissible evidence in the record from which I could draw a contrary inference.

I conclude that plaintiff has made out a *prima facie* case of delivery of 1,350 cartons and outturn of 258 cartons less. Further, Neptune neither makes nor suggests a showing that the loss falls within a COGSA exception to liability.

▮ Austracan is also entitled to summary judgment on the issue of damages. In the circumstances of this case, the amount of the loss is properly proved by the contemporaneous contract for resale entered into between Austracan and Quality Food Corporation. *Internatio, Inc. v. M.S. "Taimyr,"* 602 F.2d 49, 50 (2d Cir. 1979). As that case indicates, a contemporaneous contract for resale furnishes the most accurate measure of damages suffered by a commodities importer-exporter and trader such as Austracan. That resale price preserves the trader's quantum of damages in a falling market, and limits them in a rising market.

In a continuing effort to promote a genuine issue of material fact requiring trial, Neptune argues that Austracan might have been able to have "replaced the non-delivered goods out of his own inventory, or 'covered' from some other source" (brief at 27); from this it is argued that Austracan may be entitled to only the wholesale value of the non-delivered goods. *Illinois Central Railroad v. Crail,* 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699 (1930) is cited for this proposition. *Crail,* which the Second Circuit cited and discussed in *Internatio, Inc., supra,* dealt with the claim of a coal dealer who, at the time of receipt of the short shipment, had not resold any of the coal. The proof also showed that he maintained a large stock of coal for resale, and that the complained-of shortage did not interfere with the maintenance of his usual stock. 281 U.S. at 62. This case bears no meaningful factual resemblance to the case at bar; nor is it inconsistent with the Second Circuit's rule in *Internatio, Inc.,* which concerned, as does the case at bar, a commodities trader.

Defendants complain in their brief (at 27) that Austracan did not furnish detailed information about the contract of resale until this motion was made, following a certain amount of discovery. But the opposing papers raise no factual issue as to the genuineness of the documentary proof; nor, apart from conclusory arguments, is a need for any specific additional discovery demonstrated.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment against defendant Neptune Orient Lines, Ltd. is granted.

The Clerk of the Court is directed to enter judgment in favor of plaintiff Austracan (U.S.A.) Inc. and against defendant Neptune Orient Lines, Ltd. in the amount

of $11,868.00, with interest from December 2, 1980 at 9% per annum, and costs (exclusive of attorney's fees) in an amount to be taxed by the Clerk.

The parties have not addressed in this motion Neptune's third-party complaint against Conrail. As to that question, I intimate no view. Counsel for these parties are directed to address letters to the Court, within fourteen (14) days of the date of this Order, setting forth their views on that issue; whether settlement of that aspect of the case may be achieved; and, if not, the steps necessary to prepare the case for resolution by the Court.

It is SO ORDERED.

### ON MOTIONS TO REARGUE AND AMEND

In a Memorandum Opinion and Order dated April 23, 1985, familiarity with which is assumed, the Court granted Austracan's motion for summary judgment and directed the entry of judgment against NOL in a stated amount. The Clerk complied on May 2, 1985. Defendants NOL and Conrail now move for reargument of the opinion and order of April 23, 1985. Austracan moves pursuant to Rule 59(e), F.R.Civ.P., to amend the judgment so as to make it enforceable against NOL and Conrail jointly and severally. This opinion resolves those motions.

On the motion of NOL and Conrail to reargue, oral argument is denied. Upon consideration, I adhere to the prior opinion and order, except as modified in response to Austracan's motion under Rule 59(e).

I reject Conrail's argument that the reasonableness of the acceptance of the bill of lading in this case presents a triable issue of fact. Still less does it require as a matter of law, as Conrail also contends, a judgment in favor of NOL and Conrail.

■ I accept in principle the contention that reliance upon the descriptions contained in a bill of lading must be "reasonable." In practice, what is "reasonable" depends upon the circumstances of each case.

In the case at bar, the party which accepted the bill of lading and caused payment to be made to the consignor was not the plaintiff consignee. Rather, it was the Hong Kong & Shanghai Banking Corp., with whom plaintiff had established a letter of credit in favor of the seller-consignor, Judric. Thus the reasonableness of the reliance to be evaluated is that of the bank. The distinction is important because a considerable body of law has grown up concerning the rights and obligations of banks which participate in that important facilitator of commercial transactions, the letter of credit. In *Marino Industries v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 115 (2d Cir.1982), the Second Circuit said generally:

"The parties to the commercial contract bring in a third party—the bank—to finance the transaction for them. The bank's sole function is the financing; it is not concerned with or involved in the commercial transaction. This restriction simplifies the bank's role and enables it to act quickly and surely. Because the bank is not involved in the commercial transaction, however, all its rights and duties are set out in and defined by the letter of credit. *The bank is not expected or required to be familiar with or to consider the customs of, or the special meaning or effect given to particular terms in, the trade.*" (emphasis added).

■ The bank's obligation under the letter of credit is to pay out if the documents presented comply strictly with the specifications in the letter of credit. The letter of credit at bar specified a number of documents. I am concerned with what the letter said about the bill of lading. On that subject, the letter of credit said this:

"Shipment to be effected in 20 foot pier to house containers onboard ocean bladings our order notify accountee indicating the number of this credit freight prepaid special instructions forming integral part this instrument partshipments not permitted palletized shipment prohibited."

The bill of lading presented to the bank complied with these requirements. It recited that the cargo had been shipped in a 20 foot, pier to house container. It was an onboard bill of lading. The notify party was correct. Freight was marked prepaid. There were no partial or palletized shipments.

 Conrail and NOL make much of the point that, through the error of NOL's agent, the bill of lading also included the phrases "said to contain" and "shipper's load count and seal." This is said to be inconsistent with the meaning of the required phrase "pier to house." So it is. See April 23, 1985 opinion at slip op. 13–16. But it does not follow that this inconsistency, created by NOL's own fault, brands the bank's acceptance of the bill of lading as unreasonable. The bill of lading conformed to the letter of credit, in the sense that it said what the letter required. The bill of lading can be said to be non-conforming only by reason of the additional language inserted by NOL. The bank acted unreasonably only if it was required in law to consider and understand the inconsistencies inherent in these particular ocean transportation terms, and, on the basis of such consideration and understanding, to decline payment under the letter of credit. I decline to reach such a conclusion because, as *Marino Industries* instructs, the bank issuing a letter of credit "is not expected or required to be familiar with or to consider the customs of, or the special meaning or effect given to particular terms in, the trade."

I need not reach a contrary result because the letter of credit was made subject to the Uniform Customs and Practices for Documentary Credits (1974 revision). It is true that Article 17 of the UCP provides:

"Shipping documents which bear a clause on the face thereof such as 'shipper's load and count' or 'said by shipper to contain' or words of similar effect, will be accepted unless otherwise specified in the credit."

I construe this provision to mean that, absent any relevant prohibition in the credit, such phrases in shipping documents do not in and of themselves render the documents unworthy of acceptance. Defendants stretch that principle far beyond its apparent purpose when they argue that a bank, confronted by a bill of lading which conforms with the specific requirements of the credit, is nonetheless obligated to perceive and be paralyzed by inconsistencies arising out of the erroneous inclusion by the ocean carrier of particular trade terms.

Finally on this subject, it is the doctrine of estoppel which forecloses NOL from denying the contents of the bill of lading it prepared. Estoppel is an equitable doctrine. If the loss must fall upon one of the parties to the commercial transaction, it is fair that it fall upon the party whose error created the problem.[1]

The other contentions made on the motion for reargument do not require discussion.

Plaintiff's motion to amend the judgment is granted. The record evidence compels the conclusion that the loss occurred while the shipment was in Conrail's custody. Therefore plaintiff need not rely on the "last carrier" doctrine, although I agree that the doctrine is applicable under the

---

1. In a supplemental submission (letter dated May 29, 1985), plaintiff argues that the "on board" nature of the bill of lading furnishes a separate and independent basis for liability. Reference is made to *Olivier Straw Goods Corp. v. Osaka Shosen Kaisha*, 47 F.2d 878 (2d Cir. 1931) and subsequent cases.

I do not find these authorities of particular assistance in the case at bar. They stand for the proposition that recitation in a bill of lading that the goods have been placed on board the vessel, when in fact they have not, constitutes so gross a breach that it may be likened to a deviation in the voyage, thereby depriving the carrier of any defenses the bill of lading might otherwise have conferred. The case at bar deals not with a failure to load, but rather with the effect to be given the bill of lading's description of cargo concededly placed on board. The estoppel and letter of credit cases cited in text and in the Court's prior opinion furnish more guidance in such circumstances.

cases cited by Austracan in its brief at 6–7 and its letter of May 2, 1985 at 2–3.

There is no substance to the argument of NOL and Conrail that the Jefferson affidavit, dealt with in the prior opinion at 586, creates a triable issue on this aspect of the case. Accepting *arguendo* that the documents referred to by Jefferson in his affidavit constitute non-hearsay business records, they fail to establish the fact at issue: whether or not the examining inspector made a sufficiently accurate count to determine if any of the cartons that had been shipped in the container were missing. The inspector could tell us whether or not he did that, but there is no statement from him. The documents referred to by Jefferson do not state explicitly that the inspector made such a count of the cartons. Nor may so precise a count be inferred from the documents and the customs procedures which apparently underlie them. The regulation upon which defendants particularly rely, 19 C.F.R. § 151.2(a)(1), says only that "[d]istrict directors are specially authorized to examine less than one package of every ten packages, but not less than one package of every invoice...." In the context of the present question—whether the inspector counted every single one of the cartons in the container—that regulation hurts defendants more than it helps them.

## CONCLUSION

For the foregoing reasons, the motion of NOL and Conrail for reargument is denied.

The motion of plaintiff Austracan to amend the judgment is granted. The Clerk of the Court is directed to enter judgment in favor of plaintiff Austracan (U.S.A.) Inc. and against defendant and third-party plaintiff Neptune Orient Lines, Ltd. and third-party defendant Consolidated Rail Corporation, jointly and severally, in the amount of $11,868.00, with interest from December 2, 1980 at nine (9) percent per annum, and costs, exclusive of attorney's fees, in an amount to be taxed by the Clerk.

It is SO ORDERED.